# EXHIBIT B

**Record of Interview**

Date: October 7, 2019

Attendees: Garrett Lancaster, former Validation and Training Specialist at MSA Security's Canine Validation Center, Winchester, VA
Claire Barnard, State OIG
Juliann Vadera, State OIG
Julie Silvers, State OIG

Purpose: To document Mr. Lancaster's allegation of whistleblower retaliation by MSA

Prepared by: Julie Silvers, October 10, 2019

---

On October 7, 2019, Claire Barnard, Juliann Vadera, and Julie Silvers met with Garrett Lancaster, a former Validation and Training Specialist at MSA Security's (MSA) Canine Validation Center (CVC). Ms. Barnard began the interview by explaining how the whistleblower process works and that we are in the preliminary stages and we need to gather more information. Ms. Barnard explained the protections a contractor is afforded under the law, but also said that they do not apply if a Department official made the decision to fire Mr. Lancaster. Mr. Lancaster said MSA took all actions related to his complaint but that Josh Carter—a direct-hire State Department (State) personal services contractor—was friends with MSA leaderships and no one is hired or fired from the company without his knowledge. Mr. Lancaster said he was not looking to sue MSA. He wanted to be able to work, and wants what is right for the dogs, handlers, and the program.

**Background**

Mr. Lancaster said that he began working for MSA in October 2010 as an explosive detection canine (EDC) handler. He was supposed to deploy to Afghanistan under a contract with a different federal agency but, because State placed a block on passports, he was not able to deploy for one and a half years.

In December 2015, Mr. Lancaster began working at the CVC as a canine validation and training specialist. For the validation part of his job, Mr. Lancaster tested Worldwide Protective Service (WPS) dog handlers. WPS dog handlers are tested prior to deployment and every 6 months. Mr. Lancaster set up familiarization classes for the handlers and administered the test. If the handlers passed, they would go overseas on 120-day rotations. Sometimes handlers could serve two deployments after one test. For the training part of his job, Mr. Lancaster trained dogs for the State Bureau of Diplomatic Security's Office of Antiterrorism Assistance (ATA). When he started at the CVC, Mr. Lancaster switched back and forth between the validation and training specialist assignments.



**OFFICIAL INFORMATION - DOS AUTHORIZATION FOR LIMITED USE GRANTED PURSUANT TO 22 C.F.R. PART 172**

According to Mr. Lancaster, John Hoover and Darrel Douglas were the trainers for the first ATA class at the CVC and the class did not go well because both the training and the dogs themselves did not meet the standards of Zane Roberts, the original ATA Project Manager. Mr. Robert's refusal to deploy the dogs caused friction with Josh Carter, who was the Department employee leading the program and also a former MSA employee. As a result, Zane Roberts later stepped down from the position. The dogs Mr. Hoover received could not perform all the required tasks, which Mr. Lancaster believed was the fault of the vendor. Mr. Lancaster said Karen Iovino, the veterinarian, did not like the dogs and rejected them because they were not in good health. Her rejection of the dogs created animosity between her, Mr. Carter and Mr. Hoover. Prior to the students arriving to start the course, Mr. Roberts selected four trainers to train dogs, trained them to his standards, and found a new vendor to provide better dogs. When MSA demoted Mr. Roberts from ATA Project Manager to Deputy Project Manager, MSA appointed Mike Hayes as the new ATA Project Manager.

For the validation side of his job, Mr. Lancaster said that Jeff Piacquadio, the Deputy Project Manager for WPS Operations, was his direct supervisor. According to Mr. Lancaster, there were three deputy project managers at the CVC. Along with Mr. Piacquadio, Alan Bower was the Deputy Project Manager for Facilities, and Mr. Hoover was a third deputy project manager.

**Initial Incident and Confrontation with CVC Management**

According to Mr. Lancaster, MSA's efforts to oust him started with a December 2016 incident involving Mr. Douglas, whom Mr. Hoover did not like. The incident involved the practice lines of crates and circles of cans that the testing center uses to test dogs. Mr. Lancaster said that, for the tests, some of the cans have odors and others do not. The trainers run their dogs along the lines prior to the students to validate the tests. During the incident in question, Mr. Douglas validated the test portion (the circles of cans) but not the practice portion (the lines of crates). This led MSA's lead validator to write a report [Analyst Note: Mr. Lancaster did not specify to whom the letter was addressed. JES, 10/10/2019] questioning Mr. Douglas's integrity. This report frustrated Mr. Lancaster because he believed that Mr. Douglas was a good validator and that MSA was trying to oust Mr. Douglas and replace him with friends. Based on the incident, Mr. Douglas remained with MSA but was removed from the validator role and deployed overseas in January 2017.

After the incident with Mr. Douglas, Mr. Lancaster said he "called Alan [Bower] out for trying to run people out to replace them with friends of theirs." Mr. Bower's response was that there was a lot going on that Mr. Lancaster did not know about. He also asked Mr. Lancaster if he was going to throw away a friendship over this because he had worked with Mr. Bower, Mr. Hoover, and Mr. Carter for a long time. It was at this point that Mr. Lancaster said his relationship with these individuals changed because they knew he would not lie for them and that he was not part of what they called "the canine mafia." As an example of the individuals that the CVC brought in, Mr. Lancaster said MSA hired two guys from Roanoke who knew Mr. Hoover to work on the validation team. Mr. Roberts asked Mr. Lancaster for his opinion on the new validators and Mr. Lancaster said that he thought they were doing a good job. However, their performance worsened, and it became clear that they could not "work a dog." Mr. Lancaster decided to stop covering up for Mr. Hoover. Mr. Lancaster also believed that Mr. Bower and Mr. Carter were



**OFFICIAL INFORMATION - DOS AUTHORIZATION FOR LIMITED USE GRANTED PURSUANT TO 22 C.F.R. PART 172**

trying to promote Mr. Hoover to a higher position. He noted that MSA put Mr. Hoover in charge of a course where Diplomatic Security agents went through CVC to learn about the explosive detection canines.

Eventually, each of the CVC trainers—Zane Roberts, Joe Harrington, Mark Potter, and Sam Waiter —left CVC. According to Mr. Lancaster, Mr. Harrington was recorded on video manipulating the test boxes, which eventually prompted the investigation that led to Mr. Lancaster's termination [see next section for more details]. Afterwards, Mr. Harrington transferred to the WPS side of MSA and deployed to Oman as a dog handler. When Mr. Harrington returned from Oman, he left the company. Mr. Waiter returned to his position in Connecticut. MSA hired employees from Triple Canopy to replace the trainers and Mr. Lancaster did not believe that they were qualified for the role. He told Mr. Hayes that he did not want to work with the Triple Canopy trainers, so he and Mr. Hayes arranged for Mr. Lancaster to return to the validation tasks and skip the training rotation.

**State OIG Investigation of MSA**

According to Mr. Lancaster, after the incident described above and an OIG complaint filed by MSA veterinarian Dr. Karen Iovino, MSA moved him to work for Mr. Piacquadio on the WPS side of operations in October 2017. Mr. Lancaster said that Dr. Iovino provided as much documentation as she could to the OIG, which forwarded the complaint to Mr. Carter at State. After Dr. Iovino's complaint was addressed and remedied and Mr. Carter confessed to everything, Mr. Lancaster said the case was dropped.

Later, however, the topic of a "leak" was brought up during a disciplinary conference for another employee. According to Mr. Lancaster, MSA management suspended Mr. Roberts and searched his computer because they thought he took the pictures that Dr. Iovino provided to the OIG. MSA did not find the pictures on his computer and Mr. Lancaster commented that he knew who took the pictures. Additionally, another MSA employee, Amy Callahan told Mr. Lancaster that, during this same meeting, Mr. Hoover said "when we find out it was Garrett, we will take care of him." MSA management moved Ms. Callahan's office because she talked to Mr. Lancaster. Ms. Callahan later resigned after receiving an official letter from Human Resources [Analyst Note: Mr. Lancaster did not provide additional details about the letter. JES, 10/10/2019]

OIG reopened Dr. Iovino's complaint per her request and first contacted Mr. Harrington and Mr. Lancaster for interviews. MSA did not have an ethics policy at the CVC even though it was a requirement for government contracting. Mr. Lancaster had an at-will work agreement with MSA that included a non-disclosure agreement (NDA). A portion of the NDA was determined to be illegal, so Mr. Lancaster signed a new at-will work agreement.[1] Mr. Harrington signed a new agreement while he was in Oman.

[1] The NDA was modified after OIG released a Management Assistance Report (ESP18-03) highlighting the violation of federal law contained in MSA's confidentiality prohibition. The NDA did not provide an exception for reporting fraud, waste, or abuse as required by federal appropriations law. OIG recommended that the Department require MSA to modify its NDA or terminate MSA's contract.



**OFFICIAL INFORMATION - DOS AUTHORIZATION FOR LIMITED USE GRANTED PURSUANT TO 22 C.F.R. PART 172**

According to Mr. Lancaster, once OIG investigators began contacting people at the CVC, Mr. Hoover asked him what they were going to do. Mr. Lancaster's colleague, Mr. Harrington, convinced him to tell Mr. Piacquadio about the OIG investigators contacting him. Mr. Lancaster said, when he did so, Mr. Piacquadio "freaked out" and told Mr. Hayes, the project manager. Next, Mr. Hayes told Mr. Hoover, Mr. Bower, and Mr. Carter about the OIG investigators. According to Mr. Lancaster, Mr. Piacquadio told him and Mr. Harrington to be honest and talk to the OIG investigators. However, Mr. Carter would not talk to them after it became clear that the OIG investigators were not going away.

Mr. Lancaster said that during one meeting, Mr. Hayes warned the staff to "be aware of what you are telling them [the investigators] because you don't want to be the one to jeopardize a $100 million contract." Mr. Lancaster did not recall the date of the meeting, but it involved six of the CVC validators and possibly an MSA vice president. When two OIG investigators came to interview CVC staff, MSA lawyers were there. A new MSA employee, Tim Roach, later asked about the animosity he noticed towards Mr. Lancaster and Mr. Harrington from Mr. Carter. Other staff were noticing the tension as well.

Mr. Lancaster also said that, when representatives of the Virginia State Medical Board visited the CVC to investigate a separate complaint, MSA management "freaked out" because the investigators were able to access the facilities.

According to Mr. Lancaster, MSA filed a defamation lawsuit against Dr. Iovino and he was named as a cooperating witness and co-conspirator against MSA. MSA also subpoenaed Mr. Roberts and Dr. Iovino, and searched their phones and computers for any documents that they shared. [redacted] Mr. Lancaster also said that both told him that on April 23, 2019, the OIG issued an affidavit identifying him, Dr. Iovino, Mr. Roberts, and one other person as cooperating witnesses in its investigation of MSA and its employees. Mr. Lancaster has not seen the lawsuit or the affidavit and he was not sure whether Mr. Roberts and Dr. Iovino had seen them either.

**Allegation of Test Tampering and Termination**

On May 10, 2019, Mr. Lancaster went on a field trip with his kids and asked Mr. Harrington to take over for him validating the dog tests for that day. Mr. Harrington told Mr. Lancaster that, on that day, the initial dog that validated the test did not find one of the odors in the testing area. Mr. Harrington told him that one of the handlers cued the second dog and that dog found the odor that the initial dog missed. Mr. Carter told Mr. Harrington to run the test, but Mr. Harrington was not comfortable with it because the test was unfair and if the dogs failed, they cannot work. Mr. Harrington also told him that it did not look good for him (Mr. Harrington) because management saw him on video and sent him home with his dog. Management later called Mr. Harrington and told him to return to the CVC on Monday, May 13, at 8:00 am. When Mr. Harrington showed up at the CVC, MSA management told him that Mr. Bower—the deputy project manager who watched the video—saw him rubbing a training aid on the test boxes, thus manipulating the box. They said that he could either resign or they would terminate him. Also, on May 12, 2019, Jeff Johnson, a Vice President, Mr. Hayes, and all the validators were called into a meeting and given



OFFICIAL INFORMATION - DOS AUTHORIZATION FOR
LIMITED USE GRANTED PURSUANT TO 22 C.F.R. PART 172

a one-page standard operating procedures (SOP) that said once Mr. Carter says a test is good, it cannot be touched.

On May 21, 2019, Mr. Piacquadio called Mr. Lancaster into a meeting with Mr. Piacquadio, Mr. Bower, and Peter Capizzi, Chief Human Resources Officer, who participated in the meeting by phone. When he was called in, Mr. Lancaster asked if he was going to be fired. Mr. Bower asked Mr. Lancaster why he would rub training aid on a box or manipulate a box, to which Mr. Lancaster responded that he hadn't. Mr. Bower then told him that they had a video but, when Mr. Lancaster asked to see the video, Mr. Capizzi told him that he could not but maybe could when they completed their investigation.

When Mr. Bower described what he saw in the video, Mr. Lancaster said he may have been adjusting the boxes. Mr. Piacquadio responded that there is a difference between manipulating and adjusting a box and he would be able to tell the difference when he watched the video. They never showed Mr. Piacquadio the video despite his role as Mr. Lancaster's direct supervisor. Ms. Barnard asked Mr. Lancaster what he meant when he said he was adjusting the boxes. Mr. Lancaster explained that for the tests, they have 2 rows of 10 boxes or luggage. During a test, as a dog runs down the lines, they may bump the boxes that they identified as having a scent. In these cases, after the tests, the testers need to adjust the boxes the dogs identified so that the rows of boxes are uniform for the next dog and handler.

At that point, Piacquadio, Bower, and Capizzi told Mr. Lancaster that they were going to take his dog and send him home on administrative leave until they completed their investigation. Mr. Lancaster did not have time to clear out his desk before he left but he was able to take his personal phone. They took his computer while he was in the meeting. They took his dog and sent him home on administration leave.

On June 7, 2019, Mr. Hayes and Mr. Capizzi called Mr. Lancaster to discuss his termination. Mr. Lancaster said he recorded this call. Mr. Hayes and Mr. Capizzi told him that he did not follow procedures. In response, Mr. Lancaster asked how he could be responsible for something that was not documented. Mr. Capizzi acknowledged that the procedure was not documented in writing. When Hayes and Capizzi claimed Mr. Lancaster wiped something on the boxes, he said Mr. Piacquadio told him to wipe down the "hot bags" (bags with the scent in them) with a wet towel. According to Mr. Lancaster, validators cannot manipulate the cans but can adjust the boxes. Mr. Lancaster said it would be normal if he was seen wiping the boxes before the test and adjusting them afterwards, but he was not allowed to see the video. Mr. Capizzi said he could not see the video because it was owned by State. He also said that a third-party expert viewed the video and determined that he had manipulated the test boxes. When Mr. Lancaster asked if the tape showed other validators doing the same thing—wiping or adjusting boxes—the men told him that they could not talk about other validators.

At this point, the MSA managers told Mr. Lancaster that he could resign or be fired. Mr. Lancaster said he would not resign if he could not see what he was accused of doing. Mr. Lancaster gave us a copy of the termination letter he received from MSA stating its loss of confidence in Mr. Lancaster.



**OFFICIAL INFORMATION - DOS AUTHORIZATION FOR LIMITED USE GRANTED PURSUANT TO 22 C.F.R. PART 172**

[redacted]

When Ms. Barnard asked Mr. Lancaster if he received formal performance reviews during his time at the CVC, he responded that he thought he had two formal performance reviews. The first was in 2018 and he never saw a formal performance review document. For the second, in 2019, he did a self-assessment. According to Mr. Lancaster, both performance reviews were positive and he never received a verbal reprimand in the 8 years he worked for MSA.

According to Mr. Lancaster, it is standard MSA protocol to video record everything that happens on the WPS side of MSA. He said he does not know why they record the sessions but initially it was for transparency. MSA maintains the videos for 6 months. At one point, Jason Bowman, who works under Mr. Bower, asked if there was a way to determine who the lead validator was on a given day. He knows that all the other validators wipe down the boxes. Now, if a dog moves a box during the test, they fail. Additionally, the validators are required to keep the regular and "hot" boxes separate to avoid contamination.

**MSA Expanding Operations**

Mr. Lancaster said that MSA is now implementing what it calls "Plan B," which is MSA conducting all training for the CVC so that it is self-validating. According to Mr. Lancaster, Mr. Carter said the pass rate for dogs and handlers was so high because Mr. Harrington and Mr. Lancaster were giving away tests. To address this, they used a computer randomizer to pick the odors they would use in the test and the boxes where they would place the odors. Mr. Carter told him that the OIG required MSA to use the randomizer, but the randomizer did not affect the high pass rate. The pass rate briefly went down but then went back up again. They modified the randomizer so that it picked more variables and the validators did not receive the test until a few days before the test, which allowed for less time to undermine the test. Mr. Lancaster said MSA wanted to reduce the pass rate so that it could fail all the dogs, CVC can bring in its own dogs, and self-validate the dogs. With this "Plan B," MSA could make more money by purchasing, training, and validating the dogs. Additionally, MSA brought it Steve Sheridan as the permanent lead validator for the CVC.

According to Mr. Lancaster, MSA now has a separate contract to provide dogs for all of WPS, not just ATA. Additionally, MSA build a new building in anticipation of Plan B.

[redacted]

[redacted]

**Additional Contacts**

---

[redacted]



**OFFICIAL INFORMATION - DOS AUTHORIZATION FOR LIMITED USE GRANTED PURSUANT TO 22 C.F.R. PART 172**

Mr. Lancaster told us that, if we wanted to speak with others about the ATA program at the CVC, Joe Harrington and Frank "Butchy" Tortorella would probably be willing to speak with us.

**Request for Extension of 41 USC 4712**

Ms. Barnard ended the interview by asking Mr. Lancaster for an extension. She explained that, under 41 USC 4712, OIG has 180 days following receipt of a report of whistleblower reprisal to complete an investigation and, if the OIG is not able to complete the investigation within this period of time, it must request an extension from the complainant. Mr. Lancaster said he was willing to grant the extension.



**OFFICIAL INFORMATION - DOS AUTHORIZATION FOR LIMITED USE GRANTED PURSUANT TO 22 C.F.R. PART 172**