# EXHIBIT C

**Record of Interview**

| | |
|---|---|
| Date: | February 24, 2020 |
| Attendees: | Garrett Lancaster, former MSA employee/whistleblower |
| | Juliann Vadera, Julie Silvers, Claire Barnard ESP/ State OIG |
| Purpose: | Garrett Lancaster's Allegation of Whistleblower Retaliation by MSA Security |
| Prepared by: | Claire Barnard, February 25, 2020 |

On February 24, 2020, Julie Silvers, Juliann Vadera, and Claire Barnard spoke with Garrett Lancaster, former MSA employee and whistleblower, on the telephone from OIG's office at 1700 North Moore Street, Rosslyn, Virginia.

This meeting memorandum is based on contemporaneous notes that Silvers, Vadera, and Barnard took independently and does not follow the chronology of the discussion. We spoke from approximately 10am to 11:30am.

**Background**

Silvers explained to Mr. Lancaster that we had follow-up questions covering a wide range of topics, some of which stemmed from viewing the videotapes, and asked if he had any questions. Mr. Lancaster inquired as to whether we had viewed the videotapes and we confirmed we had.

**Code of Conduct**

Mr. Lancaster said he and other MSA employees were given a copy of the Code of Conduct and were required to sign it. He does not have a copy of it because it was one of the things MSA kept when it terminated him. MSA did not provide a copy of the Code of Conduct during the termination meeting.

**May 21 Meeting**

Silvers asked Mr. Lancaster who was present at the May 21, 2019 meeting in which he was put on administrative leave. Lancaster said Alan Bower and Jeff Piacquadio were physically present in the room and Peter Capizzi from MSA's Human Resources in New York was on the telephone. Mr. Lancaster stated that he was "positive" that Mr. Piacquadio was in the meeting. He recalled that it was Mr. Piacquadio's first day back at work after his vacation and he was the person who called Mr. Lancaster and told him to come to the office.[1] Mr. Lancaster said John Hoover was present in the area but not involved in the meeting. When he arrived in the conference room, Mr. Lancaster said the first thing Mr. Bower asked him was, "why would you

[1] There is disagreement as to who from MSA attended the meeting. Mr. Piacquadio said he did not attend it as he was still on vacation and that John Hoover and Alan Bower represented MSA in person with Mr. Capizzi on the telephone. MSA management did not document the meeting and did not create a formal administrative leave notice in Mr. Lancaster's file. Mr. Capizzi, MSA's Chief Human Resources Officer, told OIG that Mr. Hoover was there and that he did not think he was required to document the meeting.



OFFICIAL INFORMATION - DOS AUTHORIZATION FOR LIMITED USE GRANTED PURSUANT TO 22 C.F.R. PART 172

rub a training aid on a box?" Mr. Piacquadio said when he looked at the videos, he would be able to tell the difference between manipulating and adjusting the boxes. During the meeting, they sent him home and said he would be hearing from them. Mr. Lancaster did not receive documentation regarding the administrative leave. Mr. Hoover took Mr. Lancaster's dog and equipment after the meeting.

**MSA Guidance for Validators**

Prior to May 13, 2019,[2] MSA did not provide any written guidance to the validators. After Joe Harrington was observed by Alan Bower touching the boxes, Mike Hayes, MSA's project manager at the CVC, and Jeff Johnson, MSA's Vice President of Government Services, brought all the validators together and provided guidance in the form of a piece of paper with three bullet points on it. Referring to one of the bullet points on the page, Hayes and Johnson said no one was permitted to make any changes to the canine tests after the Department signed off on it. All validators had to sign the guidance acknowledging they received it.

Previously, Jeff Piacquadio would tell Lancaster and the other validators to "prepare the test" for the class, which was interpreted to adjust the boxes and suitcases as needed. Sometimes Piacquadio would tell them to wipe boxes.

Lancaster acknowledged adjusting the boxes with his feet; it was the practice that everyone did when he arrived. Managers never told him not to and he was sure they had seen them doing this and there was no guidance stating that adjusting with feet was prohibited. He learned by trial and error, and used his feet rather than his hands as he was concerned about cross-contaminating explosive scents. He said he used one foot to adjust so he could keep the other foot scent free until he realized that it didn't matter. Although he has not seen the videos in which he is moving items with his foot, he assumed what was being described was him adjusting the boxes after the training aid had been placed inside as the training aid (explosive scent) could cause the bag or box to turn askew and he and the other validators would straighten them. Most dogs only alert to the hot box if not straightened. He further explained that the new suitcases MSA used did not have flat bottoms, they curved and bowed out and everyone started adjusting them. Lancaster noted it could be an unfair advantage to a dog because only the hot bags (those with the training aid) would be turned since the suitcases were akin to being on a pivot and the training aid would cause them to turn whereas the others would be straight. He said, because of their design, it was easier to lift one side of the bags to adjust them rather than tapping it multiple times. Lancaster has seen Josh Carter adjust training aids, but it was not a common occurrence. They also wiped down the bags after the tests because dogs would have left their saliva and nose prints on the bags. Mr. Lancaster usually wiped bags after replacing the training bags.

He said it would be foolish to tamper with the tests as they knew they were being watched on cameras by Alan Bower, Jeff Piacquadio, James Olds, Steve Sheridan, Josh Carter, and John Hoover. He added that he knew Mr. Bower was watching, so he figured that his adjustment of the boxes was acceptable. Mr. Piacquadio also warned the validators that these individuals were monitoring via cameras. He also said that the adjustments occurred first thing in the morning after the training aids were placed in the containers but also throughout the day. He inquired as to

[2] Mr. Lancaster could not recall the exact date but said it was the Monday after May 10, 2019 that MSA issued the guidance. A review of a May 2019 calendar shows that May 13 was the date.



OFFICIAL INFORMATION - DOS AUTHORIZATION FOR
LIMITED USE GRANTED PURSUANT TO 22 C.F.R. PART 172

whether MSA looked at the tapes during the training days of Monday, Tuesday, and Wednesday, or focused on the testing days of Thursday and Friday because they would have seen the same adjustments on training days. No supervisors said that he should not wipe or adjust the bags and Mr. Lancaster believed that they had seen him do it before.

Mr. Lancaster also said he was told by MSA's chemist, Rick Strobel, that "burping" -- adjusting a box or bag by pressing down on it—actually harms the chances of the next dog recognizing the scent because it will decrease the efficacy of the scent rather than intensify it because the scent will disperse after being pushed out. Burping a bag would only help a dog recognize the scent if the handler did it as the dog was sniffing it. He assumed that the MSA management never consulted Mr. Strobel about the actions of the validators. The only way to successful "burp" the bag would be directly in front of the dog's face.

**Loss of Confidence Letter**
Mr. Lancaster was not aware that the Department issued a Loss of Confidence (LOC) letter about him, he did not receive a copy or any notification. [redacted]

**Prior Working Relationships with the COR and MSA**
Mr. Lancaster worked with Josh Carter, Alan Bower, and John Hoover at the Roanoke, Virginia Police Department beginning in 2004. He also worked with them and Darrell Douglas at Ronco Security. Mr. Lancaster met Mike Hayes when he went to work for MSA in 2010. He did not work with Piacquadio until he started at the CVC.

At one point, Josh Carter lived in a house near the CVC with Darrell Douglas and Carrie Bouffard. Mr. Lancaster lived with Alan Bower, John Hoover, and Darrell Douglas.

**OIG Investigations**
Mr. Lancaster said that Mr. Tortorella was not involved in any of the OIG investigations but that he was a friend of Zane Roberts and the MSA management did not like Mr. Roberts. Mr. Torterella and Mr. Roberts were retired ATF agents, as was Mr. Hayes. They believed Mr. Roberts knew about Karen Iovino's complaint to OIG and that he failed to tell MSA management, which is why Mr. Roberts was terminated. According to Mr. Lancaster, Roberts had informed Joe Atherall, an MSA vice president in NY about Dr. Iovino's complaint. Once Roberts produced an email documenting this, his departure from the company was changed to a voluntary separation.

Lancaster said another reason Mr. Roberts was disliked was because he was unwilling to go along with "Plan B," the effort to expand the CVC from a validation center to a training and validation center. The Department was reluctant to expand MSA's contract because the dog test pass rates were very good and there did not seem to be a reason to increase MSA's

---

[redacted]



OFFICIAL INFORMATION - DOS AUTHORIZATION FOR
LIMITED USE GRANTED PURSUANT TO 22 C.F.R. PART 172

responsibilities. Mr. Lancaster said Mr. Carter tried various ways to decrease the pass rates, including generating random tests, but nothing was working. He blamed the need for the randomization on the OIG investigations. Mr. Lancaster believes that when Mr. Harrington was observed rubbing his hands on the boxes it provided an opportunity to blame Mr. Harrington for manipulating the tests, as well giving MSA a basis for reviewing the old tapes for other possible discrepancies. And Mr. Carter was able to persuade the Department that three individuals had been artificially inflating the pass rates.

Mr. Lancaster spoke with several individuals from OIG. He first met with [redacted] from INV and Jason Staub and Amy Bowers about the health and wellness of the dogs. Mr. Hayes initially told Mr. Lancaster to talk to OIG and tell the truth and the investigation will be over. The first meeting he had with Jason and Amy took place at the CVC, but it was awkward because MSA's attorney was present and the OIG representatives did not want to ask questions that might cause trouble for Mr. Lancaster with MSA. Consequently, he met Jason and Amy at a separate location and provided them with information about his concerns.

**Darrel Douglas**

Mr. Lancaster was not sure as to why Mr. Douglas left the CVC, but he was aware that he was accused of smelling like alcohol and failing to properly validate a practice line. Mr. Lancaster did not place much value on the accusations and said it was ridiculous because practices are never validated. He said Nolan Garcia, a validator, told Alan Bower to write a letter about Mr. Douglas's failings or he would go the media and OIG. Mr. Hoover helped write the letter. Mr. Lancaster believes they were trying to oust Mr. Douglas so they could replace him with others they were friendly with. Mr. Carter said that he will make sure Mr. Douglas never works a dog again.

Mr. Douglas was given the opportunity to leave the CVC and transfer to MSAO. Mr. Harrington asked if he could transfer to another section instead of termination, like Mr. Douglas, but MSA did not allow this.

**Zane Roberts**

Mr. Roberts previously held Mike Hayes job, as the project manager of the CVC, but he voluntarily stepped down when he believed Josh Carter and the others were conspiring against him. Mr. Roberts went to ATA and then MSA placed him in Research and Development and replaced him with Mr. Hoover. As previously noted, Mr. Roberts did not agree with the expansion plan and did not want to be a part of it. During a meeting with MSA management, either Gerald Goss or Mick Kennedy, told the MSA employees they were not to speak to Mr. Roberts as they believed he was giving Karen Iovino information. Mike Hayes was present at the meeting and John Hoover may also have been there.

No one from MSA ever asked Mr. Lancaster if he had spoken with Mr. Roberts but he knew they suspected it because Amy Callihan, a former MSA employee, was told by John Hoover that they believed Garrett was feeding Roberts' information. They said they would take care of it, which was interpreted as getting rid of him. Mr. Lancaster told Mr. Hayes, "I know you think I'm leaking, but it's not me" and Mr. Hayes replied that he appreciated knowing that he did not leak information.



**OFFICIAL INFORMATION - DOS AUTHORIZATION FOR LIMITED USE GRANTED PURSUANT TO 22 C.F.R. PART 172**

**Mike Hayes**
Lancaster had an after-hours conversation with Mr. Hayes about what was happening at the CVC and expressed his concerns that "things were getting crazy." He told Mr. Hayes that he would be willing to leave as soon as his dog Blake was eligible to retire if MSA would let him keep his dog, and that he wanted to do what was best for MSA. Lancaster said Hayes told him he appreciated his sentiments.

**John Hoover**
Lancaster and Hoover had a falling out over the Mr. Hoover's participation in ousting Mr. Douglas. Lancaster thought he "stabbed him [Douglas] in the back." Lancaster did not hold Hoover in high regard and thought the dogs he trained were horrible. He also said that Mr. Hoover's wife routinely called Josh Carter and asked when her husband would be promoted to a position he deserved, which rubbed Lancaster the wrong way.

**Alan Bower**
Mr. Lancaster was angry after the Darrell Douglas incident and he and Mr. Bower had a conversation in which Lancaster told him the things they were doing at the CVC were "not cool" and based on greed. He was embarrassed by their behavior and by the fact they were not even trying to hide their misdeeds. Bower asked Lancaster if he was going to throw away long-standing friendships over it, but Lancaster said that Bower and the others would not call him a friend unless it was convenient for them.

**Josh Carter**
Lancaster thinks MSA's management is willing to protect Josh Carter because they are all friends and he has gotten them easy, high-paying jobs. He heard that MSA paid rent for Mr. Carter's apartment. He also questioned why Loren Bachman was employed by DS one day and by MSA the next. He did not understand why Mr. Bachman would give up the security of a government job to work as a contractor.

**Travis Harvey**
Lancaster did not work much with Harvey. He said Harvey started as a validator but then moved to the FAM (familiarization) course, and then the ATA side of the CVC after that.

**Travis Clements**
Clement is a validator and they worked quite a bit together.

**Wayne Shaw**
Mr. Lancaster said he has seen Mr. Shaw wiping bags; he has seen most of the validators adjust bags. In his opinion, the ones who didn't were lazy and didn't care about the tests. He also said that Mr. Shaw took Frank (Butchy) Tortorella's place in research and development (R&D) at the CVC, such as it is. He did not think they did much in the way of R&D.

**Kevin Pate**
Mr. Lancaster did not interact much with Kevin Pate but he would see him observing the testing lines.



**OFFICIAL INFORMATION - DOS AUTHORIZATION FOR LIMITED USE GRANTED PURSUANT TO 22 C.F.R. PART 172**

**Third Party Investigation**
When MSA advised Mr. Lancaster about the third-party investigation, he asked what the investigator would be using as a standard to determine if his actions were inappropriate but MSA did not tell him. Lancaster does not know who the third party is and has not seen his/her report of findings. Mr. Lancaster said, if the reviewer watched 6 months of videos, they would have seen everyone doing the same thing. When they accused him of manipulating tests, Mr. Lancaster said MSA management never gave him any details about dates and times.

**June 7 Termination Call**
Mr. Lancaster recorded the telephone call on June 7 in which Mike Hayes and Peter Capizzi informed him that the investigation had confirmed that his actions tampered with the tests and offered him the choice of resigning or being terminated. Mr. Lancaster said he could not resign because he did not believe he had done anything wrong and thus he was terminated.

**Performance Appraisal**
When asked about statements in his written performance appraisal from 2018 that noted areas for improvement included interpersonal communications and accepting things he cannot control, Mr. Lancaster said he was fine with those statements. In his self-assessment, he said he included learning to delegate more and working more with others. He said there were people at the CVC with whom he did not care to work, and Jeff Piacquadio knew it. Mr. Lancaster said he was never rude to anybody but would tell Mr. Piacquadio, "keep them away from me." Mr. Lancaster said he was vocal with Mr. Piacquadio about things he observed at the CVC that he was not OK with. For example, Josh Carter would make changes to the randomizer that the CVC used to select test set-ups.



**OFFICIAL INFORMATION - DOS AUTHORIZATION FOR LIMITED USE GRANTED PURSUANT TO 22 C.F.R. PART 172**