Opposition, Ex. 1

Office of Inspector General
United States Department of State

Type text here

UNCLASSIFIED

March 2, 2021

FROM: OIG – Jeffrey D. McDermott, Assistant Inspector General

TO: A/OPE – Michael W. Derrios, Procurement Executive

SUBJECT: Report of Investigation Pursuant to 41 U.S.C. § 4712
OIG Whistleblower Case 2019-1385 (Garrett Lancaster)

The Office of Inspector General (OIG) is required to investigate complaints filed by employees of contractors, subcontractors, grantees, or subgrantees, or by personal services contractors, who provide credible information alleging that they were subject to reprisal for whistleblowing activity.[1] Upon completion of the investigation, OIG is required to submit a report of the findings of its investigation to the complainant, the contractor or grantee concerned, and the head of the agency concerned. Not later than 30 days after receiving the report of OIG's findings, the head of the agency concerned is required to determine whether there is a sufficient basis to conclude that the contractor or grantee subjected the complainant to a reprisal prohibited by law and to issue an order either denying relief or taking one or more of the remedial actions specified in the law.[2]

As described below, OIG received a complaint from Garrett Lancaster, a former employee of a Department of State (Department) contractor, alleging he was terminated from his position after having made protected whistleblower disclosures. OIG found that Mr. Lancaster made protected disclosures and was the subject of a reprisal because his employer, Michael Stapleton Associates, Ltd. (MSA), did not show by clear and convincing evidence that it would have taken the same personnel actions absent Mr. Lancaster's disclosures.

**Allegation**

On June 9, 2019, Mr. Lancaster filed a whistleblower retaliation complaint with OIG under 41 U.S.C. § 4712, alleging that he was terminated from his position at MSA in retaliation for cooperating with OIG in its investigations of MSA for alleged mismanagement, fraud, and mistreatment of canines. On April 7, 2020, Mr. Lancaster re-filed his complaint with OIG.[3]

[1] 41 U.S.C. § 4712.
[2] 41 U.S.C. § 4712(c)(1).
[3] OIG requested that Mr. Lancaster refile his complaint because OIG faced delays investigating his complaint as a result of the COVID-19 pandemic and resulting operational challenges.

OIG reviewed Mr. Lancaster's complaint and determined that it contained sufficient details to allege a claim of retaliation for engaging in a protected activity. Consequently, OIG initiated an investigation of the allegations.

**Background**

Mr. Lancaster began his work as an explosive detection canine handler at MSA, a Department contractor, in 2010. In 2015 he began working as a validation and training specialist at the Canine Validation Center (CVC) in Winchester, VA.[4] In this capacity, he worked with other MSA employees and Department officials and was responsible for training and testing explosive detection canines and their handlers to ensure they met the Department's security standards. MSA employs three Deputy Project Managers (DPM) at the CVC, each of whom has different responsibilities: one is responsible for CVC facilities and operational support ("DPM 1"), one is responsible for CVC validations and testing services ("DPM 2"), and one is responsible for CVC training ("DPM 3"). Mr. Lancaster reported to DPM 3.

On May 10, 2019, DPM 1 observed through video surveillance that an MSA validator other than Mr. Lancaster ("Validator 2") was rubbing his hands on a testing box that contained an explosive odor after the test had been set up for the teams of canines and handlers to begin testing. Explosive odors are placed in boxes or suitcases, which are then used to test canine detection proficiency of the materials hidden in the containers. DPM 1 was concerned by his observation because handling the box after placement could transfer an odor to the outside of the box, making it easier for a dog to detect the explosive odor and thus affecting the legitimacy of the test. MSA gave Validator 2 an opportunity to explain his actions and then sent him home while MSA management investigated further. MSA notified the Department about the incident, stating that Validator 2's actions were a "direct violation of CVC SOPs," and that they would review available video from December 2018 through May 2019 to determine if other validators had also deviated from standard operating procedures (SOPs).[5] MSA initially asked two MSA CVC employees to conduct the video review, but MSA pulled one from the assignment due to other MSA requirements.

On May 13, 2019, MSA gave Validator 2 the choice to resign or be terminated. Validator 2 elected to resign. During OIG's interview with Validator 2, he admitted to making the detection easier for canines, but said the job was simply a source of additional income in retirement, so it was not worth disputing the claims against him. He also hoped that if he resigned MSA would allow him to keep the dog he worked with at the CVC.

On May 21, 2019, DPM 1 and other MSA management met with Mr. Lancaster[6] and, after explaining that an internal video review suggested that he rubbed a training aid or manipulated the canine

---

[4] In late 2019, the Bureau of Diplomatic Security (DS) changed the name of the CVC to the Diplomatic Security Canine Training and Operations Center (DSCTOC) and expanded MSA's contract to train and validate canines. In this report, OIG uses the CVC nomenclature since that was the facility's name at the time of the whistleblower disclosures and alleged retaliation.

[5] Canine Validation Center Incident Report, CVC-2019-015, 1 (May 10, 2019). MSA records and stores 6 months of video of the canine detection tests. The video is typically used to resolve a dispute when there is a disagreement about the outcome of a test and is not viewed in "real time." The Department pays for the equipment but does not require monitoring.

[6] There is conflicting information as to which MSA management officials attended the meeting. DPM 1 told OIG he attended the meeting. Mr. Lancaster's supervisor, DPM 3, told OIG he was on vacation at the time and did not attend and that DPM 2 filled in for him, which was not consistent with Mr. Lancaster's recollection. MSA's outside counsel informed OIG that DPM 3 attended the meeting, but not DPM 2. DPM 2 told OIG he had attended the meeting. The Chief HR Officer participated by telephone, but no one at MSA documented the meeting; the Chief HR Officer told OIG he did not believe he was required to do so.

detection testing boxes after placement, placed Mr. Lancaster on administrative leave. Mr. Lancaster denied manipulating the boxes but offered as a potential explanation for his actions, noting that he may have had to adjust the boxes. MSA had no written policies or SOPs regarding adjusting boxes at the time of the events at issue here; however, according to both a former Project Manager (PM) at MSA and Mr. Lancaster's supervisor at the time, it is common for validators to have to adjust boxes, sometimes with their feet. During the May 21 meeting, Mr. Lancaster asked to see the videos so he could explain his actions, as he was unsure what the MSA managers were referring to, but MSA's Chief HR Officer denied his request. MSA told him the videos were the property of the Department and therefore, MSA did not have the authority to show him the videos.[7] The MSA officials told Mr. Lancaster that he would remain on administrative leave pending a second review by an MSA employee who would review the prior 6 months of video and determine if his actions were appropriate. According to the CEO, the Chief HR Officer and in-house General Counsel recommended the second review.

The next day (May 22, 2019), MSA officials submitted a follow-up incident report to the Department that specifically named Mr. Lancaster, claiming that he "appeared to have repeatedly deviated from CVC SOPs in coordination with [Validator 2] and that in at least one instance a part-time MSA employee, CVC Validator [Validator 3], similarly deviated from the CVC SOPs."[8]

According to MSA's outside counsel, MSA completed its review of the prior 6 months of videos, and concluded that Mr. Lancaster, Validator 2, and another part time validator ("Validator 3") had been involved "in SOP deviations on over 10 separate occasions."[9] On May 23, 2019, MSA sent a final incident report to the Department, which identified incidents of validators deviating from SOPs. Of the 13 dates on which such incidents occurred, Mr. Lancaster's actions caused concern on three days: December 7, 2018; March 28, 2019; and May 9, 2019.[10]

Also, on May 23, 2019, the selected second reviewer, an MSA employee not associated with the CVC, began his review of the videotapes. On June 3, 2019, he sent his report to MSA's in-house General Counsel.[11] He also discussed his findings with MSA's Chief HR Officer. MSA provided OIG with a copy of this review. The second review did not identify employees by name but noted dates and 28 anomalies that "appeared to be inconsistent with normal testing protocols or appeared to be intentional efforts to create an advantage to the teams." After OIG's request to MSA for information linking the anomalies noted in the second review with individuals, Mr. Lancaster was identified as an individual of concern on

[7] MSA officials provided multiple rationales about who was allowed to view the videos: they told OIG that only MSA managers were allowed to watch the videos but when OIG advised them that non-managers had also reviewed them, the company could not explain why. Separately, MSA told OIG that the videos were the property of the Department and it could not show anyone the videos without prior Department approval.

[8] Canine Validation Center Incident Report, CVC-2019-015 (Follow-up No. 2), 1 (May 22, 2019).

[9] This quoted information was provided by MSA's outside counsel. According to outside counsel, an MSA management official emailed the MSA in-house General Counsel and Chief Human Resources (HR) Officer on May 17, 2019, informing them that the review had been completed and it revealed that Mr. Lancaster and two other employees had deviated from the SOPs on over 10 occasions. OIG requested a copy of the May 17, 2019, email notification but was informed by MSA's outside counsel that the entire email was "subject to attorney/client privilege." MSA made no attempt to redact privileged information and provide OIG the factual portions of the email, or even information already waived by its outside counsel's disclosure. MSA's assertions regarding the attorney-client privilege are addressed in further detail in the contractor's burden section of this report.

[10] Canine Validation Center Incident Report, CVC-2019-015 (Follow-up No. 3), 2-3, 12, 13-14 (May 23, 2019).

[11] At the time of this investigation, MSA's in-house General Counsel no longer worked with the company. She left in August 2019.

two dates: December 7, 2018 (6 incidents) and May 2, 2019 (1 incident).[12] The only date where Mr. Lancaster's actions stood out to both the initial reviewer and the second reviewer was December 7, 2018.[13]

On June 7, 2019, the CVC PM, DPM 3, and MSA's Chief HR Officer met with Mr. Lancaster via teleconference and told him he could resign or be terminated. Mr. Lancaster told OIG that he did not believe he had done anything wrong, and therefore declined to resign. According to Mr. Lancaster, he again asked to see the videos, but his request was denied. The MSA officials then terminated Mr. Lancaster verbally during the teleconference, and later in a follow-up letter dated the same day, which was signed by the CVC PM. There is considerable dispute as to which MSA official made the decision to terminate Mr. Lancaster. According to the CVC PM, although he signed Mr. Lancaster's termination letter, MSA's Chief HR Officer and in-house General Counsel made the decision both to terminate Mr. Lancaster and to not show him the videos in question. The Chief HR Officer told OIG that he recommended termination and drafted the termination letter but noted that the decision to terminate Mr. Lancaster was made by MSA's CEO in coordination with other MSA management. MSA's CEO told OIG that the Chief HR Officer, with input from the in-house General Counsel, made the decision to terminate Mr. Lancaster and that his role was limited to only concurring with the recommended course of action. In the termination letter, the CVC PM noted that MSA terminated Mr. Lancaster's employment because he "did not follow protocol as a validator on several occasions" and that his "actions violated MSA's Code of Conduct and undermine[d] MSA's relationship with the U.S. Department of State."[14] The CVC PM told OIG that the Code of Conduct provision Mr. Lancaster violated was to "always do the right thing."

On June 17, 2019, several weeks after MSA informed the Department that a validator's actions were "a direct violation of CVC SOPs," MSA finalized "Security Operations Management System, Annex 3 WPS Program Requirements," the pertinent SOP, which prohibited kicking, manipulating, and dropping the boxes or containers, among other requirements.[15] MSA had not developed or distributed to employees any SOPs relevant to Mr. Lancaster's actions at the time the incidents occurred.

Prior to Mr. Lancaster's complaint, OIG received other allegations of MSA misconduct and retaliation related to the CVC. The basis for Mr. Lancaster's belief that he was retaliated against is intertwined with the other complaints of misconduct and, for contextual reasons, is explained below.

---

[12] MSA's Chief HR Officer and Mr. Lancaster's supervisor reviewed videos and identified the individuals involved in the second review, not the second reviewer.

[13] The first and second reviews did not concur in many respects. For example, the second review noted 12 dates of concern, whereas the first review noted 13 dates of concern. Also, the second review noted specific times of incidents of concern, whereas the document memorializing the first review referred only to dates. In addition, the reviews did not agree with respect to most of the dates and individuals whose actions caused concern. These discrepancies will be discussed in the Contractor's Burden section below.

[14] Termination letter from MSA Security to Garrett Lancaster, June 7, 2019.

[15] The initial draft SOP that MSA provided to OIG was the "WPS Standard Operating Procedures for Familiarization and Validation Testing" dated June 6, 2019. When OIG requested final, signed copies of MSA's SOP for the CVC, the company sent the "Security Operations Management System Program Description" dated June 19, 2019, along with six annexes for various components of its Security Operations Management System, which included guidance for its validation testing, with the initial issue date of April 22, 2019. MSA's Contract Officer wrote in an email to the Department on March 9, 2020 in which she confirmed that the relevant SOPs were not completed or distributed to employees at the time of Mr. Lancaster's actions relevant to this complaint.

In July 2017, an MSA employee, a veterinarian, contacted OIG and accused MSA, as well as Department officials, of misconduct, including procurement fraud, misuse of government vehicles, and mistreatment of canines. In August 2017, the veterinarian was terminated by MSA and later filed a whistleblower retaliation complaint with OIG. From 2017 through Mr. Lancaster's termination in June 2019, OIG investigated several of the veterinarian's allegations and interviewed multiple MSA employees, including Mr. Lancaster, both with and without the knowledge of their supervisors. Some employees expressed concern they could not be forthcoming in the presence of MSA officials and wished to meet away from the CVC's premises. MSA was aware of OIG's interview of Mr. Lancaster, during which he divulged information that MSA had engaged in what he believed was gross mismanagement and fraud.

After receiving the veterinarian's misconduct allegations in July 2017, OIG requested information from the Department's Office of Acquisitions Management (AQM), the office responsible for awarding and administering contracts.[16] AQM notified the Bureau of Diplomatic Security's Office of Overseas Protections (DS/DO) about the complaints, and eventually, the complaints were conveyed to MSA. A former MSA employee told OIG that MSA management was angry about the veterinarian's complaints and was systemically harassing and undertaking efforts to terminate employees whom it believed had provided information to the veterinarian whistleblower. The former MSA employee recalled a meeting in which the CVC PM asked employees if they "want[ed] to jeopardize people's jobs?" which the individual interpreted as an effort to discourage employees from cooperating with OIG. The former employee also told OIG that MSA management referred to Mr. Lancaster and the veterinarian as "crazy" and to Mr. Lancaster as a "bad element".

In March 2019, MSA filed a defamation lawsuit against the veterinarian that alleged, in part, that the veterinarian "conspired" with "disgruntled current MSA employees" to "destroy MSA through a systematic campaign of defamation," referring to her filing "reports with various government agencies that had oversight over the company's activities." On April 1, 2019, in connection with the lawsuit, MSA subpoenaed documents from the veterinarian and specifically asked for communications between the veterinarian and Mr. Lancaster. Mr. Lancaster was the only current MSA employee mentioned in this subpoena. On June 7, 2019, MSA terminated Mr. Lancaster.

## Standard for Alleging a Claim of Reprisal

As an employee of a Department contractor, Mr. Lancaster is entitled to file a complaint under 41 U.S.C. § 4712. OIG initially reviewed this complaint to determine whether (1) he made a protected disclosure, (2) his employer took an action against him that could be considered an act of reprisal, and (3) his complaint was filed within 3 years of the alleged reprisal.

### Protected Disclosures

Under 41 U.S.C. § 4712(a), information qualifies as a protected disclosure if it is made to, among other individuals and entities, an agency's Inspector General. The protected disclosures must constitute information that the employee reasonably believes is evidence of gross mismanagement of a Federal contract or grant, a gross waste of Federal funds, an abuse of authority relating to a Federal contract or

[16] AQM was aware of the allegations, as the veterinarian had previously contacted AQM expressing similar concerns. An AQM official had notified DS and OIG about the concerns.

grant, a substantial and specific danger to public health or safety, or a violation of law, rule, or regulation related to a Federal contract (including the competition for, or negotiation of, a contract) or grant.

Mr. Lancaster's participation in a March 2018 OIG interview concerning allegations of gross mismanagement and fraud constitute a protected disclosure because the information was given to the Office of Inspector General, a covered entity, and dealt with information that he reasonably believed to be evidence of gross mismanagement of a Federal contract, as well as violations of law, rule, or regulation related to a Federal contract.[17] For example, Mr. Lancaster provided information to OIG that resulted in a $240,000 recovery under the Program Fraud Civil Remedies Act. Mr. Lancaster also provided credible evidence related to the investigation of a related allegation of misuse of Federal funds.

**Alleged Reprisal**

The law defines reprisal as being "discharged, demoted, or otherwise discriminated against" as a result of protected disclosures.[18] In this case, MSA terminated Mr. Lancaster's employment on June 7, 2019, after he made a protected disclosure.

**Timely Complaint**

OIG received Mr. Lancaster's first complaint on June 9, 2019, which is within the 3-year statute of limitations from the date of the alleged reprisal, which occurred on June 7, 2019.

**Burdens of Proof**

Under 41 U.S.C. § 4712(c)(6), the legal burdens of proof specified in 5 U.S.C. § 1221(e) are controlling for the purposes of any investigation conducted by an Inspector General. Under 5 U.S.C. § 1221(e)(1), an employee must present a preponderance of evidence that he or she made a protected disclosure, which was a contributing factor in a personnel action taken against him or her.[19] The employee can show this through direct or circumstantial evidence, such as evidence that (a) the official taking the personnel action knew of the disclosure and (b) the personnel action occurred within a period of time such that a reasonable person could conclude that the disclosure was a contributing factor in the personnel action.

Once an employee has met this burden, the burden of proof shifts to the employer, which must present clear and convincing evidence that it would have taken the same personnel action in the absence of such disclosure.[20] In *Carr v. Social Security Administration,* the court adopted the following test:

---

[17] 41 U.S.C. § 4712(a)(2) lists seven bodies to whom a protected disclosures may be made: (1) A Member of Congress or a representative of a committee of Congress; (2) an Inspector General; (3) the Government Accountability Office; (4) a Federal employee responsible for contract or grant oversight or management at the relevant agency; (5) an authorized Department of Justice or other law enforcement agency official; (6) a court or grand jury; and (7) a management official or employee who has responsibility to investigate, discover, or address the misconduct.

[18] 41 U.S.C. § 4712(a)(1).

[19] The Merit Systems Protection Board, which adjudicates federal employee whistleblower cases, has held that an employee must demonstrate by a preponderance of the evidence that the protected disclosure was a contributing factor in the personnel action. *Caddell v. Dep't of Justice*, 52 M.S.P.R. 529 (Jan. 31, 1992). Preponderance of evidence is considered the lowest standard of proof; the burden of proof is met if there is greater than a 50 percent chance that, based on all the evidence shown, the complainant's claims are true.

[20] 5 U.S.C. § 1221(e)(2); *Carr v. Social Security Admin.*, 185 F.3d 1318, 1322 (Fed. Cir. 1999).

> [W]hen determining whether an agency has shown by clear and convincing evidence that it would have taken the same personnel action in the absence of whistleblowing, . . . the following factors [should be considered]: the strength of the agency's evidence in support of its personnel action; the existence and strength of any motive to retaliate on the part of the agency officials who were involved in the decision; and any evidence that the agency takes similar actions against employees who are not whistleblowers but who are otherwise similarly situated.[21]

The courts have defined clear and convincing evidence as the degree of proof "which produces in the mind of the trier of fact an abiding conviction that the truth of a factual contention is 'highly probable.'"[22] However, an employer does not need to prove each of the factors by clear and convincing evidence. Rather, the three factors will be weighed together to determine whether as a whole the evidence is clear and convincing, and a strong showing on one factor may be sufficient.[23]

**Complainant's Burden**

Mr. Lancaster demonstrated by a preponderance of both direct and circumstantial evidence that his protected disclosure was a contributing factor in the personnel action taken against him. A former MSA employee who worked with Mr. Lancaster at the CVC told OIG that, following the veterinarian's whistleblower complaint and the OIG investigation, management at the CVC was systemically harassing employees involved in the OIG investigation and preparing efforts to terminate them. A second former MSA employee told OIG that various MSA officials undertook efforts to identify employees who had provided information to OIG and that they believed Mr. Lancaster had done so. A third former employee told OIG that Mr. Lancaster had "a target on his back" because of his cooperation with OIG and that MSA was trying to find a reason to get rid of him.

Mr. Lancaster also provided circumstantial evidence by showing that the officials taking the personnel action knew of his disclosure and the personnel action occurred within a period of time such that a reasonable person could conclude that the disclosure was a contributing factor in the personnel action. Multiple MSA management officials told OIG that they were aware of OIG's investigations of alleged misconduct at MSA and of Mr. Lancaster's participation in at least one OIG interview.[24] The personnel action, Mr. Lancaster's termination, took place in June 2019, approximately 1 year after Mr. Lancaster's

---

[21] 185 F.3d at 1323 (citing *Geyer v. Dep't of Justice*, 7 M.S.P.R. 682, 688, aff'd, 116 F.3d 1497 (Fed. Cir. 1997)).

[22] *Road & Highway Builders v. U.S.,* 702 F.3d 1365, 1368 (Fed. Cir. 2012), (citing *Am-Pro Protective Agency v. U.S.*, 281 F.3d 1234, 1240 (Fed. Cir. 2002).

[23] *Lucchetti v. Dep't of Interior*, 2017 MSPB LEXIS 743 (Feb. 15, 2017) (citing *Phillips v. Dep't of Transportation*, 113 M.S.P.R. 73, 77 (2010)).

[24] Mr. Lancaster's supervisor, MSA's CEO, the Chief HR Officer, and MSA's former General Counsel were involved in Mr. Lancaster's termination. Although the CEO and Chief HR Officer denied that they were aware of Mr. Lancaster's involvement in OIG's investigations into misconduct at MSA, they acknowledged that they knew OIG had interviewed MSA employees at the time of Mr. Lancaster's termination. Mr. Lancaster's supervisor, DPM 3, knew Mr. Lancaster spoke with OIG because he arranged the meeting. MSA's former General Counsel was certainly aware of Mr. Lancaster's interview with OIG as Mr. Lancaster was the only current employee named in MSA's litigation against the veterinarian.

interview.[25] While MSA management may not have known the specific details of Mr. Lancaster's disclosures, there is a preponderance of evidence to conclude that MSA management likely believed Mr. Lancaster was providing information about MSA to OIG as part of the criminal investigation.[26] For example, Mr. Lancaster was the only current employee named in MSA's subpoena in its defamation lawsuit against the veterinarian.[27] No MSA employee interviewed by OIG, including the CEO, could explain why Mr. Lancaster was the only current employee singled out as part of MSA's March 2019 lawsuit. Approximately 2 months after filing the defamation lawsuit naming Mr. Lancaster, MSA terminated him.

Because Mr. Lancaster demonstrated that his protected disclosure was a contributing factor in the personnel action taken against him by a preponderance of the evidence, the burden shifts to MSA to present clear and convincing evidence that it would have taken the same personnel action in the absence of Mr. Lancaster's disclosures.

**Employer's Burden**

Because Mr. Lancaster met his burden, the burden of proof now shifts to MSA to provide clear and convincing evidence that it would have terminated Mr. Lancaster in the absence of his protected disclosures. The clear and convincing standard is a heightened burden of proof, and it applies in this context because, when it comes to proving the basis for a personnel decision, the employer "controls most of the cards" and thus "bears a heavy burden to justify its actions."[28] In examining each of the *Carr* factors outlined above, OIG reviewed records provided by MSA, the Department, and other parties involved, and interviewed government officials, MSA managers, and former MSA employees.

The first factor that the courts use to weigh whether an employer has met its burden is the strength of the evidence in support of the personnel action. In examining this factor, the Merit Systems Protection Board examines the evidence supporting the personnel action and whether there were "legitimate reasons" for the personnel action.[29] OIG found that the basis and support for Mr. Lancaster's alleged misconduct changed repeatedly and that MSA failed to provide clear and convincing evidence in support of his termination.

Based on the initial review of the videos, MSA reported to the Department that Mr. Lancaster deviated from CVC SOPs on three separate dates (December 7, 2018; March 28, 2019; and May 9, 2019).[30] The

---

[25] The MSPB has held that 12 to 15 months can satisfy the knowledge-timing test for showing that a disclosure was a contributing factor in the personnel action. *See, e.g.*, *Inman v. Dep't of Veterans Affairs*, 2009 M.S.P.B. 182, *12 (Sept. 8, 2009) (a gap of approximately 15 months between the disclosure and the action satisfied the knowledge/timing test), which also references several other cases that have addressed this.

[26] MSA gained knowledge of the specific nature of the criminal investigation a few months prior to Mr. Lancaster's termination. On March 13, 2019, a special agent in OIG's Office of Investigations spoke to MSA's counsel and informed him that OIG was investigating allegations of improper kickbacks, false claims submitted to the Government, and other Federal crimes involving MSA and MSA personnel.

[27] Subpoena Duces Tecum (Civil) – Attorney Issued, Commonwealth of Virginia at 4, *Michael Stapleton Associates, LTD v. Karen Iovino*, Arlington County Circuit, Case No. CL19000901-00, certified by Ryan Berry, April 1, 2019.

[28] *Chambers v. Dep't of the Interior,* 2011 M.S.P.B. 7, 28 (January 11, 2011) (quoting 135 Cong. Rec. S2780 (Mar. 16, 1989) (statement of Sen. Levin)).

[29] *Baker v. Dep't of Defense,* 2016 MSPB LEXIS 4567, at *30 (2016).

[30] Canine Validation Center Incident Report, CVC-2019-015 (Follow-Up No. 3), 2-3, 12, 13-14 (May 23, 2019). According to MSA officials, another CVC validator conducted this initial review of the CVC video surveillance footage.

second review identified Mr. Lancaster as an individual of concern on two dates (December 7, 2018, and May 2, 2019).[31] However, during the time of the December and March alleged incidents, the CVC did not actually have SOPs developed or distributed to employees, and during the time of the May alleged incidents, it is unclear whether any SOPs were in place or had been communicated to employees. In response to OIG's request for the relevant SOPs, MSA provided an SOP that was labeled "Draft" and had an effective date of June 6, 2019. The CVC PM told OIG that the date on the SOP was not accurate and provided updated SOPs on February 3, 2020, which were signed as final on June 19, 2019. The SOPs include a provision that states, "At no time during testing will any vessel or container be intentionally manipulated, touched, kicked, or lifted off the ground and dropped back down."[32] However, these SOPs would not have been in effect during the initial dates identified during the reviews of video surveillance footage, and it is unclear whether SOPs were in place during the identified incidents in May 2019 or when MSA placed Mr. Lancaster on administrative leave in May 2019.

In a March 2020 email to the Department's Contracting Officer, MSA acknowledged that at the time of Mr. Lancaster's actions, MSA did not have SOPs in place for the CVC. In the email, MSA also stated that the company relied on the requirements in the contract that govern validation testing as the standard concerning Mr. Lancaster's actions. In MSA's November 2019 letter to OIG, DPM 3 provided a summary of validation testing, stating, "All validation testing at the CVC follows requirements set by MSA's contract with the State Department, Worldwide Protective Services (WPS) program requirements, and direction of DoS management staff." The same letter stated that Mr. Lancaster violated "CVC validation protocols" and that his actions violated MSA's Code of Conduct and the Standards of Conduct clause of the CVC contract. Although the contract and task order discussed procedures for validation, they did not specify that adjusting or lifting test boxes was prohibited. Similarly, the Standards of Conduct did not discuss procedures for validation testing, but rather discussed the contractor's responsibility for maintaining satisfactory employee performance, competency, and integrity.

After completing the initial CVC review, the Chief HR Officer and former General Counsel, the same individuals that eventually recommended Mr. Lancaster's termination, recommended that an MSA employee not associated with the CVC conduct a second review of the alleged misconduct. The results of this review concluded that Mr. Lancaster's actions did not comply with "normal testing protocols." but again MSA did not provide evidence of "normal testing protocols." The final report stated that "anomalies were noted which appeared to be inconsistent with normal testing protocols or appeared to be intentional efforts to create an advantage to the teams being tested." The MSA official who conducted the second review told OIG that he assessed the validators based on his experience as an explosive detection canine specialist, but did not use any written criteria or protocols for the review.

Finally, on June 7, 2019, MSA terminated Mr. Lancaster, stating, "As a result of our investigation, it was determined that you did not follow protocol as a validator on several occasions. Your actions violated MSA's Code of Conduct and undermine MSA's relationship with the U.S. Department of State." The CVC PM told OIG that Mr. Lancaster violated the code's principle that MSA employees "always do the right

[31] MSA's Chief HR Officer and Mr. Lancaster's supervisor reviewed videos and identified the individuals involved in the second review, not the second reviewer.

[32] Although the section of the SOPs discussing this requirement has an "Initial Issue" date of April 22, 2019, the most recent version was approved on June 17, 2019. Therefore, it is not clear whether the SOPs included this requirement as of April 22, 2019. Even if the requirement was effective on April 22, 2019, the CVC did not have SOPs in place for the first 4 to 5 months of its video review.

thing." OIG notes that "always do the right thing" is in the prefatory section of the manual that contains general language but is not under the "Guidelines for Doing Business" section where employee expectations and requirements are set forth.

In addition to providing inconsistent justifications concerning what specific rule or policy Mr. Lancaster violated, MSA's documentary evidence in support of Mr. Lancaster's termination is far from clear or convincing. Although the two reviews that MSA conducted agreed that Mr. Lancaster deviated from protocols on December 7, 2018, the two reviews conflicted on other findings. MSA represented that the second review confirmed the findings of the first review – that Mr. Lancaster had "deviated from CVC validation procedures." However, the two reviews did not produce the same results. Generally, of the 17 dates for which the reviewers found possible deviations, there were only 5 dates (less than 30 percent) for which the reviewers agreed that deviations had occurred. MSA did not provide OIG with documents or information directly from the initial reviewer; only a summary prepared by the CVC PM in coordination with the MSA Vice President of Government Services and MSA's legal counsel. Nevertheless, assuming the summary is correct, for Mr. Lancaster, the reviewers agreed that his actions deviated from protocol on only one date (December 7, 2018), though the reviews claimed that his actions deviated from protocol on three other dates as well. The first review found deviations on March 28 and May 9, 2019, whereas the second review did not find deviations on those dates but did find that Mr. Lancaster deviated on May 2, 2019. The discrepancies call into question the certainty of the alleged misconduct and demonstrate the subjective nature of the reviews.

Moreover, the first review concluded that three validators had engaged in questionable activity, whereas the second review identified five to six validators. As noted previously, the second reviewer did not know the validators and did not identify them by name in his review. Upon OIG's request, MSA provided the names of validators for each incident in the second review, with the exception of one validator who was not named in the information provided to OIG and whose identity MSA could not readily determine from its records. MSA noted that the actions of the additional validators were permissible because their supervisors had authorized the actions, but MSA did not identify what protocol was being followed or explain why it was proper.[33]

Additionally, the evidence does not clearly identify which review formed the basis for Mr. Lancaster's termination, particularly given that the reports produced different findings. MSA officials told OIG that the second review was the basis for Mr. Lancaster's termination. However, MSA's letter to OIG in support of Mr. Lancaster's termination summarized only the instances from the first review. Furthermore, to support Mr. Lancaster's termination, MSA provided OIG with videos of instances from the first review but no videos of the instances identified in the second review.[34]

[33] For example, the reviewer commented that on March 15, 2019, the fourth validator appeared to open a box on the testing line, inspect it, and re-tape it. MSA explained that action was proper since the original test box had been changed and the validator was ensuring the new box was "ok." Another example involved the fifth validator, who, on May 10, 2019, placed a bag with an explosive odor on the test line, and then wiped the seams and top of the bag. The reviewer expressed concern and indicated that he "need[ed] to discuss with on-site personnel to explain action." MSA told OIG that the validator "follow[ed] proper protocol by bringing the bag out and wiping down with wipe."

[34] Additionally, in noting the alleged improper actions, MSA officials only provided the Department with the results of the first review and the corresponding videos. MSA officials did not provide the Department with the results from the second review until almost a year after terminating Mr. Lancaster when the Contracting Officer requested the report in March 2020. MSA did not provide corresponding videos.

MSA argued that the Department's actions following the incident reports demonstrate that Mr. Lancaster's actions were inappropriate. MSA told OIG that the Department issued a cure notice following the CVC's first review, citing the notice as evidence of the seriousness of Mr. Lancaster's actions. However, the notice was based on preliminary information (i.e., the CVC's first review), the veracity of which is called into question by inconsistencies in the latter review. Furthermore, the Department's concerns were not the result of its own independent assessment of the situation, but rather based on characterizations made by MSA regarding Mr. Lancaster's conduct.

Similarly, in November 2019, MSA told OIG, "Based on the incident reports provided by MSA to the State Department, as well as the State Department's own investigation of Mr. Lancaster's misconduct, the Government has declared Mr. Lancaster *ineligible* to provide future services in connection with the WPS program." MSA's characterization of the Department's actions is inconsistent with the information DS provided to OIG. In response to OIG's request, the Department did not provide any documentation indicating that it conducted an independent investigation of Mr. Lancaster's alleged misconduct.[35] Additionally, as with the cure notice, the Department's issuance of the violation of contract standards letter appears to have been based entirely on MSA's characterization of Mr. Lancaster's and others' actions in the Incident Report, and its response to the cure notice, which did not include information on the contradictions between the results of the company's two video reviews.[36]

The mixed and sometimes inconsistent evidence in support of Mr. Lancaster's termination is insufficient to meet the clear and convincing standard. MSA's only evidence in support of Mr. Lancaster's termination is contained in the videos. The differing conclusions of the video reviews demonstrates that this evidence is ambiguous and subject to interpretation. Furthermore, there is no evidence (other than the videos) that Mr. Lancaster was actually trying to influence the outcome of the tests.[37] MSA never questioned Mr. Lancaster about alternative explanations for the instances in which he made contact with boxes or even considered alternative explanations. Finally, it is uncertain whether Mr. Lancaster's actions even violated MSA policies in effect at the time.

The second *Carr* factor looks at the existence and strength of any motive to retaliate on the part of the individuals who were involved in the decision. MSA officials said there was no reason to retaliate against Mr. Lancaster and cited as support the fact that many MSA employees had been interviewed by OIG and were not terminated. However, none of the other employees were named in the defamation lawsuit, which suggests that MSA believed that Mr. Lancaster had provided adverse information about MSA to OIG. Moreover, as noted above, three former MSA employees told OIG that MSA management was unhappy about the OIG investigations and believed Mr. Lancaster was a source of information.

---

[35] In response to OIG's request for any and all documents related to MSA's termination of Mr. Lancaster, the Department provided four documents: 1) MSA's May 23, 2019, Incident Report, 2) the Contracting Officer's May 28, 2019, cure notice, 3) MSA's June 7, 2019 response to the cure notice, and 4) the Department's WPS Division Chief's August 16, 2019, letter to MSA on Mr. Lancaster's violation of contract standards.

[36] The Department also told OIG that when it made an inquiry to the CVC PM in regard to this incident, he responded with "please put that in writing and send it to [the Vice President of Government Services]. MSA has retained legal counsel regarding this matter."

[37] For example, MSA assessed Mr. Lancaster's intent in making contact with the boxes, specifically whether he was trying to advantage one particular canine vendor but found no such pattern.

As noted previously, the March 2019 defamation lawsuit alleged that the former veterinarian was disgruntled and conspired with other disgruntled former and current MSA employees to "destroy MSA through a systematic campaign of defamation."[38] The lawsuit's statement of facts asserts that:

> "the Conspirators' primary *modus operandi* for taking down MSA was to file endless knowingly false and defamatory reports with various government agencies that had oversight over the company's activities and create a cloud of alleged wrongdoing over MSA's practices and employees."[39]

Given that Mr. Lancaster was the only employee still working at MSA who was named in its lawsuit and that the company believed he had made derogatory statements about MSA to OIG, MSA's narrative in its Statement of Facts in connection with its lawsuit is further evidence that MSA likely harbored a retaliatory motive against Mr. Lancaster.

The third *Carr* factor—examining whether MSA took similar action against individuals who did not make protected disclosures but were otherwise similarly situated—offers a mixed assessment. MSA alleged that Mr. Lancaster and two other validators deviated from CVC protocol. A June 7, 2019, letter from MSA to the Department's Contracting Officer said that the three individuals' "misconduct was inexcusable and has resulted in their termination."[40] According to the CVC PM, MSA had not terminated anyone for deviating from testing protocols at the CVC in the 3 years before it terminated these three validators in 2019.

While MSA told the Department that it terminated all three individuals, it appears that MSA took a far more aggressive posture toward Mr. Lancaster, as opposed to the other two validators who were not whistleblowers. For example, Mr. Lancaster's termination letter stated:

> As you know, our customers rely on us to fulfill our contractual commitments, including following all protocols, which directly impact the safety or potential safety of individuals both here and abroad. Over the past several weeks, an independent investigation was conducted, reviewing certain aspects of the CVC operation. As a result of our investigation, it was determined that you did not follow protocol as a validator on several occasions. Your actions violated MSA's Code of Conduct and undermine MSA's relationship with the U.S. Department of State.

However, the termination letter for another validator stated:

> As we have discussed, with changes we are making at the CVC, we will not be requiring your services at the CVC in the future. We appreciate your service to the Company.

MSA did not provide an explanation for the difference in language.

OIG's examination of the three *Carr* factors found inconsistent and incomplete evidence in support of Mr. Lancaster's termination, strong evidence of a retaliatory motive, and mixed evidence as to whether MSA took comparable action against individuals who were similarly situated but were not

---

[38] Complaint at 1, *Michael Stapleton Associates, LTD, d.b.a. MSA Security v. Karen Iovino,* Circuit Court for Arlington County, VA, case number CL19000901-00, March 19, 2019.
[39] *Ibid*, at 8
[40] MSA Response to Cure Notice: Letter from MSA Contracts Officer to Department of State Senior Contracting Officer, June 7, 2019.

whistleblowers. Accordingly, the evidence does provide a" high probability" "which produces in the mind of the trier of fact an abiding conviction" that MSA would have terminated Mr. Lancaster's employment absent his protected disclosure. Put another way, the evidence is not clear and convincing that MSA would have terminated Mr. Lancaster's employment absent his protected disclosures.

**Conclusion**

During a witness interview in 2018, Mr. Lancaster made protected disclosures to OIG regarding mismanagement and fraud relating to a Federal contract. According to Mr. Lancaster and former CVC employees, following his disclosures, MSA management at the CVC suspected that Mr. Lancaster had shared adverse information with OIG. In March 2019, MSA filed a defamation lawsuit against another former MSA employee and OIG whistleblower and subpoenaed documents about MSA that were exchanged between the whistleblower and Mr. Lancaster. At the time of the subpoena, Mr. Lancaster was the only current MSA employee whose documents were sought, though other MSA employees had participated in OIG interviews. Shortly thereafter, MSA terminated Mr. Lancaster's employment. Because Mr. Lancaster met his burden under 41 U.S.C. § 4712 to demonstrate a prima facie case of retaliation, MSA must provide clear and convincing evidence that it would have taken the same action in the absence of his protected disclosures.

MSA did not provide clear and convincing evidence that it would have terminated Mr. Lancaster absent his protected disclosures. As noted above, documentary evidence and statements by key MSA officials offered by MSA in support of the termination were often inconsistent and/or incomplete. While there is mixed evidence as to the treatment of similarly situated employees, there is strong evidence of a retaliatory motive on the part of key decisionmakers. Therefore, OIG concludes that MSA engaged in retaliation prohibited by 41 U.S.C. § 4712.