CLERKS OFFICE U.S. DIST. COURT
AT CHARLOTTESVILLE, VA
FILED
May 03, 2024
LAURA A. AUSTIN, CLERK
BY: s/ D. AUDIA
     DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

| | |
|---|---|
| GARRETT LANCASTER, | ) |
| Plaintiff, | ) Civil Action No. 5:23-cv-00063 |
| v. | ) |
| | ) By: Elizabeth K. Dillon |
| MICHAEL STAPLETON ASSOCIATES, LTD d/b/a MSA SECURITY, INC., | ) United States District Judge |
| Defendant. | ) |

**MEMORANDUM OPINION**

Plaintiff Garrett Lancaster sued his former employer, Michael Stapleton Associates, LTD (MSA), contending that it terminated his employment in response for his whistleblower activity in reporting alleged abuses by MSA at its Canine Validation Center (CVC) in Winchester, Virginia.[1] His complaint asserts a single count of discrimination in violation of 41 U.S.C. § 4712, based on alleged retaliation against him.[2]

MSA has not yet filed an answer. Pending before the court is MSA's motion to strike portions of the complaint, pursuant to Federal Rule of Civil Procedure 12(f). In its motion, MSA contends that Lancaster's claim is based, in part, on allegations that he did not administratively exhaust prior to his bringing suit. It thus asks the court to strike those allegations and any claims based on them and require Lancaster to file an amended complaint with the "offending matter" removed. (Mem. Supp. Mot. to Strike 2, Dkt. No. 9-1.) The motion is fully briefed, and no party has requested a hearing. For the reasons set forth herein, MSA's motion will be denied in part

---

[1] The facility's name changed in 2019, but for consistency, the court uses CVC throughout this opinion.

[2] The complaint also contains a fleeting reference to "a denial of due process" resulting from the original favorable determination in response to Lancaster's administrative complaint subsequently being overturned. (Compl. ¶ 7, Dkt. No. 1.) The complaint only lists a single claim, however, of discrimination in violation of § 4712.

and granted in part.

## I.  BACKGROUND

MSA is a security company that provides intelligence, training, and investigative services in the public and private sector.  At all times relevant to Lancaster's claims, MSA had a contract with the State Department (DOS) under a program called Worldwide Protective Services (WPS). Pursuant to that contract, MSA trained and cared for canines that, at the CVC, were trained to detect explosive devices and materials and tested—also referred to as validated—on those skills. The CVC became operational in 2016, and it included a fully licensed veterinary hospital staffed with veterinarians, veterinary technicians, and support staff to provide care to the canines. Lancaster was hired in 2010 and worked for MSA at other locations; he began working in December 2015 at the CVC as a Validation and Training Specialist (VTS).  He served in that role until June 7, 2019, when he was terminated.  (Compl. ¶¶ 9–10, 12, 17–18, 21.)

MSA stated that it was terminating Lancaster because he (along with two other test validators) had deviated from CVC standards by manipulating a test after it was validated.  This decision was purportedly based on two separate reviews of video evidence of testing, in which Lancaster and two other testers were found to have improperly manipulated a test.[3]  (*Id.* ¶¶ 57–65 (discussing termination).)

Two days after his termination, on June 9, 2019, Lancaster submitted a hotline complaint with the Office of the Inspector General of the Department of State (OIG), in which he alleged that he was terminated in retaliation for his participation in a prior OIG investigation.  (June 2019 Hotline Report).  (Compl. ¶ 5; MSA Mot. to Strike, Ex. A, Dkt. No. 9-2.)  Specifically, he

---

[3]  For purposes of the pending motion, it is not necessary to discuss all of Lancaster's allegations, or the factual detail about the grounds given for his termination.  As discussed herein, the court's analysis focuses on the closeness of the relationship between the administrative complaint Lancaster made to OIG and the allegations in this lawsuit.

2

stated that he spoke with "several investigators" at OIG and with "investigators for the House Oversight Committee for National Security." (2019 Hotline Rep. 1–2.)

The prior investigation Lancaster referenced was triggered by a complaint filed by a CVC veterinarian and colleague of Lancaster's, Dr. Iovino. Dr. Iovino filed her OIG complaint in July 2017, and Lancaster participated in interviews with OIG as part of the investigation OIG conducted into Dr. Iovino's allegations. (Compl. ¶¶ 40–41, 44–46.)

After submission of his June 2019 Hotline Report, the OIG investigated his report and interviewed Lancaster twice during its investigation. The first interview occurred in October 2019 and the second in February 2020. (MSA Mot. to Strike, Exs. B, C, Dkt. Nos. 9-3, 9-4.)

The OIG concluded that MSA had improperly retaliated against Lancaster. (Compl. ¶ 6.) That decision was later reversed by the Division Director of the Office of the Procurement Executive of DOS (Division Director), representing a final decision on the matter. (*Id.* ¶ 7.)

In its motion to strike, MSA emphasizes that the June 2019 Hotline Report and the notes from the two interviews of Lancaster reference the Iovino investigation, but they do not indicate with any specificity what Lancaster said during the course of the OIG's Iovino investigation, the names of the persons with whom he spoke, or even the topics of discussion, except to note in general terms that he had "cooperated with the OIG" and spoke to investigators about "different aspects" of Dr. Iovino's complaint. (Mem. Support Mot. to Strike 4, Dkt. No. 9-1.) MSA also acknowledges that the notes from the February 2020 interview refer to specific persons from OIG with whom he spoke about "the health and wellness of the dogs." (Mot. to Strike, Ex. C, at 5.)

Because of the purported lack of detail in these documents, MSA argues that many of the allegations in Lancaster's complaint were not included in his 2019 Hotline Report and that he did

3

not exhaust them. As to those issues, then, it contends that his complaint is not properly before the court. (Mem. Supp. Mot. to Strike 6.) In particular, MSA's motion to strike asks that paragraphs 1, 26, 40–47, and 69 be stricken and that plaintiff be directed to submit an amended complaint without the "offending allegations and focusing solely on the narrow issues he brought to OIG." (*Id.* at 1.) The court discusses the content of those paragraphs in context below.

Separately, MSA also asserts that paragraph 46 of the complaint also should be struck on an independent ground.[4] In that paragraph, Lancaster alleges that "upon information and belief," he "was interviewed about" particular topics. MSA correctly notes that the topics of an interview in which he participated should be within Lancaster's personal knowledge. (Mem. Support Mot. to Strike 11–12.) Relying on authority noting that pleading "upon information and belief" is inappropriate when the plaintiff should have personal knowledge of the stated allegations (*id.* at 11), MSA asks that the entire paragraph be struck.

## II.  DISCUSSION

### A. Rule 12(f) Motion to Strike Standard[5]

Federal Rule of Civil Procedure Rule 12(f) permits the court to strike from a pleading any matter that is redundant, immaterial, impertinent, or scandalous. Fed. R. Civ. P. 12(f). "Immaterial matter is that which has no essential or important relationship to the claim for relief," and "impertinent matter consists of statements that do not pertain, and are not necessary, to the issues in question." 5C Charles Alan Wright and Arthur R. Miller, *Federal Practice &*

---

[4] The motion references "portions" of the complaint as improperly pleading "on information and belief," but the only paragraph that MSA asks to strike on this basis is paragraph 46. Similarly, MSA states that "at a minimum" the other numbered paragraphs should be struck (Mem. Supp. Mot. to Strike 11), but the court will not sua sponte consider striking paragraphs that MSA has not specifically identified.

[5] There could have been other avenues for MSA to argue that certain allegations or claims were unexhausted, but MSA styled its motion as a Rule 12(f) motion and that is how the court addresses it. *See also Iovino v. Michael Stapleton Assocs.*, 600 F. Supp. 3d 610, 617–18 (W.D. Va. 2022) (noting other potential avenues for similar concerns, but addressing under Rule 12(f), as brought by MSA).

4

*Procedure*, § 1382 (3d ed., April 2022 update).  The function of a 12(f) motion to strike is "to avoid the expenditure of time and money that must arise from litigating spurious issues by dispensing with those issues prior to trial."  *Gregory v. Belfor USA Grp., Inc.*, No. 2:12cv11, 2012 WL 2309054, at *1 (E.D. Va. June 15, 2012) (quoting *Whittlestone, Inc. v. Handi-Craft Co.*, 618 F.3d 970, 973 (9th Cir. 2010)).

Although Rule 12(f) motions are generally viewed with disfavor, *Waste Mgmt. Holdings, Inc. v. Gilmore*, 252 F.3d 316, 347 (4th Cir. 2001), they are proper where "the challenged allegations have no possible relation or logical connection to the subject matter of the controversy and may cause some form of significant prejudice to one or more of the parties to the action."  *Bailey v. Fairfax Cnty.*, No. 1:10-cv-1031, 2010 WL 5300874, at *4 (E.D. Va. Dec. 21, 2010) (quoting Wright & Miller, *supra*).  The moving party bears the burden to show that the challenged material is prejudicial.  *Iovino v. Michael Stapleton Associates, Ltd.*, 600 F. Supp. 3d 610, 618 (W.D. Va. 2022) (citing *Hardy v. Lewis Gale Med. Ctr.*, 377 F. Supp. 3d 592, 605 (W.D. Va. 2019)).  "[T]he decision of whether to strike all or part of a pleading rests within the sound discretion" of the district court."  *Id.* (citation omitted).

**B. Administrative Exhaustion Requirement**

As noted, Lancaster's claim is brought under 41 U.S.C. § 4712, which states that reprisal is prohibited if an employee discloses to certain persons identified in § 4712(a)(2) "information that the employee reasonably believes is evidence of gross mismanagement of a Federal contract or grant, a gross waste of Federal funds, an abuse of authority relating to a Federal contract or grant, a substantial and specific danger to public health or safety, or a violation of law, rule, or

regulation related to a Federal contract . . . or grant."[6]  41 U.S.C. § 4712(a)(1).

As the parties agree, Lancaster was required to administratively exhaust his remedies prior to bringing suit in federal court.  The exhaustion framework was recently set forth by another judge of this court in another case against MSA:

> A complainant who has made . . . a disclosure [under § 4712], and believes she has been retaliated against, may submit a complaint to the relevant executive agency's Inspector General. *Id.* § 4712(b)(1). This complaint must be made within three years of the retaliation. *Id.* § 4712(b)(4).

*Iovino v. Michael Stapleton Assocs.*, 600 F. Supp. 3d 610, 618 (W.D. Va. 2022).

The Inspector General is tasked with investigating the complaint and submitting a report with findings to the complainant, the contractor, and the agency head. 41 U.S.C. § 4712(b)(1). The agency head then has 30 days to determine whether the contractor improperly retaliated against the complainant.  *Id.* § 4712(c)(1).  If, as here, the agency head determines there was no retaliation, he must issue an order denying relief.  *Id.*  Thereafter, a complainant may sue the contractor "in the appropriate district court of the United States, which shall have jurisdiction over such an action."  *Id.* § 4712(c)(2).  Further, once the adverse order issues, "the complainant shall be deemed to have exhausted all administrative remedies with respect to the complaint." *Id.* As the *Iovino* court recognized, the statutory scheme "makes clear that whistleblowers working for government contractors must exhaust their administrative remedies before suing in federal court." *Id.* at 619 (collecting authority).

MSA acknowledges that Lancaster filed an administrative complaint with OIG and that he ultimately was denied relief by the State Department's Division Director.  (*See also* Compl.

---

[6] The statute further states that "an employee who . . . provides evidence of [such] misconduct in any judicial or administrative proceeding relating to waste, fraud, or abuse on a Federal contract or grant shall be deemed to have made a disclosure covered" by subsection (a)(1). *Id.* § 4712(a)(3). Lancaster's complaint neither cites to nor expressly relies upon subsection (a)(3).

6

¶ 7.)  As it did in *Iovino*, though, MSA argues that many of Lancaster's allegations are not reasonably related to his administrative complaint and not expected to follow from a reasonable administrative investigation of his complaint.  *See Sydnor v. Fairfax Cnty.*, 681 F.3d 591, 594 (4th Cir. 2012) (explaining, in context of both Title VII and the Americans with Disabilities Act, that allegations are exhausted administratively if they are "reasonably related" to the administrative filing and "expected to follow" from a reasonable investigation into the allegations included in the filing).  Conversely, where an administrative filing "reference[s] different time frames, actors, and discriminatory conduct than the central factual allegations in his formal suit," there has not been proper exhaustion.  *Chacko v. Patuxent Inst.*, 429 F.3d 505, 506 (4th Cir. 2005).

C.  **Most, But Not All of Lancaster's Allegations Are Reasonably Related to His Administrative Charge**

The court has reviewed the materials submitted by the parties, which include a record of the 2019 Hotline Report, the notes from both of Lancaster's subsequent interviews, and the OIG's March 2, 2021 investigative report (OIG Report) (Dkt. No. 15-1).  MSA's assertion that Lancaster never identified the nature of his disclosures, as part of his OIG complaint or the OIG investigation into it, is not entirely accurate.  To be sure, most of Lancaster's 2019 Hotline Report and both interviews devote more time to discussing his termination and the facts surrounding the same than other topics.  (*See* Mem. Supp. Mot. to Strike, Exs. A–C, Dkt. Nos. 9-2, 9-3, 9-4.)  But as MSA acknowledges, in his second interview, Lancaster noted that he had discussed with OIG during the Dr. Iovino investigation "the health and wellness of the dogs." (*Id.*, Ex. C, Dkt. No. 9-4.)  Moreover, the 2019 Hotline Report specifically states that the nature of his prior disclosures had fallen within the categories of "gross mismanagement of a Federal contract or grant, gross waste of federal funds, an abuse of authority relating to a Federal contract

7

or grant, and a violation of law, rule, or regulation related to a Federal contact." (*Id.*, Ex. A.) In describing Lancaster's disclosures, the OIG Report gives, as an example, that Lancaster "produced information to OIG that resulted in a $240,000 recovery under the Program Fraud Civil Remedies Act" and "credible evidence" as to an allegation of misuse of Federal funds." (OIG Rep. at 6.)

MSA insists that the OIG Report is entirely too general to be of any assistance to Lancaster. (MSA Reply 8–9, Dkt. No. 19.) But the court finds that document particularly instructive. Indeed, the allegations and other findings discussed in the report are not only "expected to follow" from a reasonable investigation, but *actually* followed from that investigation. *See Iovino*, 600 F. Supp. 3d at 623 ("The best determination of whether 'a reasonable investigation of his administrative charge would have uncovered the factual allegations set forth in formal litigation' is whether the agency's investigation in fact uncovered that information.") (citations omitted).

In addition to those mentioned above, the OIG Report also includes the following:

- a statement that Lancaster filed a whistleblower retaliation complaint alleging termination in retaliation for cooperating with OIG in its investigations of MSA for "alleged mismanagement, fraud, and mistreatment of canines," (OIG Rep. 1);

- the basis for Lancaster's belief that he was retaliated against "is intertwined with the other complaints of misconduct" [at MSA] and thus the report explains and describes those complaints "for contextual reasons," (*id.* at 4);

- a three-paragraph description of Dr. Iovino's complaint, the OIG's investigation into the same, and Lancaster's participation as a witness in the investigation, in which he "divulged information that MSA had engaged in what he believed was gross mismanagement and fraud," (*id.* at 5); and

- a description of the subjects of Dr. Iovino's complaint as including allegations of "misconduct, including procurement fraud, misuse of government vehicles, and mistreatment of canines," (*id.*).

With that background in mind, the court turns to the specific allegations MSA asks be

struck.  As noted, MSA asks the court to strike paragraphs 1, 26, 40–47, and 69.

- Paragraph 1 is the sole paragraph in a section titled "Introduction."  In it, Lancaster states that he was discriminated against in retaliation for "reporting gross mismanagement of a Federal contract or grant, a gross waste of Federal funds, an abuse of authority relating to a Federal contract or grant, a substantial and specific danger to public health or safety, and/or a violation of law, rule, or regulation related to [] Federal contracts, including via participating in federal agency and congressional investigations into said gross mismanagement, fraud, and mistreatment of canines, including medical malpractice by intoxicated and impaired medical staff, violation of animal protection and veterinary licensing laws, and abuse of authority by MSA management in failing to remediate the malpractice and retaliation . . . ."

- Paragraph 26 references Lancaster's "advocacy" as being on behalf of animal welfare and against gross waste and gross mismanagement, and also references medical personnel committing malpractice, supervisors "who neglected and abused their positions in failing to take corrective actions, and company officials failing to maintain and manage" the program.  This paragraph also states that his advocacy was "in concert with and in support of the reports of" fellow MSA employees Dr. Iovino and another named individual, and that it included advocacy internal to contractor supervisors and to state veterinary officials.

- Paragraphs 40 through 43 constitute a section called "Background Facts Specific to Protected Activity," and they discuss the fact that Dr. Iovino made reports about misconduct to OIG beginning in July 2017, and that she was terminated.

- Paragraphs 44 through 47 are part of a section titled "Protected Activities," and they describe discussions Lancaster had with OIG investigators and a member of the House Oversight Committee, from approximately March 2018 through January 2019.

- In paragraph 69, Plaintiff explains in more detail the substance of his disclosures to "the required persons and bodies."

MSA's motion is hyper-focused on the lack of specifics in Lancaster's hotline report or in his subsequent interviews as to what Lancaster told OIG investigators during the Iovino investigation, and MSA maintains that he should not be permitted to include in his complaint topics that are not referenced directly in his hotline report or in the notes of his interviews with OIG in connection with his complaint.  But the underlying basis for this objection is that he

allegedly has not exhausted his administrative remedies with regard to those claims. Aside from having to defend against supposedly unexhausted claims, it does not identify any other prejudice that it will suffer from the inclusion of the allegations in the complaint. And because the court concludes that MSA has largely failed to show the complaint refers to unexhausted claims, MSA's motion is deficient in that regard. *Cf. Iovino*, 600 F. Supp. 3d at 618 (explaining that the party moving to strike bears the burden to show prejudice).

In any event, the court is not convinced by MSA's arguments, which seem to miscomprehend the nature of Lancaster's sole claim. The sole issue in the case will be whether MSA retaliated against Lancaster, either for his participation in the Iovino OIG investigation and any disclosures he made in the context of it, or for his reports to the House Oversight committee member, which are the two portions of "protected activity" he very clearly identified in the 2019 Hotline Report and/or which were investigated by OIG. Those alleged acts of protected activity and the retaliation against him in the form of different treatment and his termination are exhausted. Indeed, as the OIG Investigative Report makes clear, information about the Dr. Iovino investigation and the supposed abuses she was reporting are relevant as background.

The conclusions of the *Iovino* court are instructive. Notably, the court refused to strike most of the allegations MSA asked to be struck from the complaint. These included allegations that the court deemed background information, legal conclusions that did not prejudice MSA, facts that were explicitly mentioned in the Department of State's record related to Dr. Iovino's complaint, and "contextualizing factual allegations." *See generally* 600 F. Supp. 3d at 622–25. The only allegations the *Iovino* court concluded should be struck were ones that attempted to expand the plaintiff's theories of recovery. In particular, the court explained that the agency filing "could not be clearer" that the plaintiff believed the retaliation took place in response to a

10

single event, the filing of an OIG complaint on a specific date. 600 F. Supp. 3d at 625. Thus, it would not allow allegations from the plaintiff that she had been retaliated against based on *other* conversations with supervisors or other persons.

 Applying that same logic here, the court easily concludes that the vast majority of the complaint's allegations to which MSA objects do not "widen the scope of the retaliation claim . . . or the theory upon which [Lancaster] sought relief." *See id.* at 624. Lancaster's June 2019 Hotline Report stated that he was a "cooperating witness for OIG" and that MSA was aware of that fact. He noted that when MSA sued Dr. Iovino in April 2019, he was named in the complaint and it was shortly after that when he was terminated. He also discussed the topics he had disclosed in general terms (mismanagement of the federal contract, waste of funds, etc.). To be sure, the alleged *subjects* of Iovino's complaint and Lancaster's witness testimony as part of Iovino's complaint are more detailed in his complaint than are set forth in either his June 2019 Hotline Report of subsequent interviews, but OIG clearly believed that Iovino's complaint itself was relevant as background information and included information about that in the OIG Report, and the general subjects of his disclosure are set forth in the relevant documents. The exact facts he conveyed need not have been "exhausted," just his claim that he was terminated for conveying them.

 Put differently, including the additional background information about what Lancaster discussed with OIG investigators does not expand his claims beyond what he exhausted. As the *Iovino* court explained in discussing what Judge Cullen termed "contextualizing factual allegations," it is permissible for a plaintiff to include additional factual allegations in her complaint that present specific examples of the general types of misconduct alleged in her agency filing. *Id.* at 623–24. Similarly, Lancaster may include factual allegations that are

11

reasonably related to his OIG complaint, so long as his theory of recovery remains the same. *See* 600 F. Supp. 3d at 626. Nearly all of the allegedly objectionable paragraphs fall in that category and either provide background for, or additional detail about, the claim Lancaster exhausted. Thus, the motion to strike will be denied in large part.

The only paragraphs that the court believes impermissibly attempt to expand the bases for recovery by Lancaster (and thus that are not properly exhausted) are paragraphs 26 and 69. In paragraph 26, Lancaster refers to "advocacy" with and in support of a different employee's reports (not Dr. Iovino), and he also references his advocacy to "Virginia based Contractor supervisors" and to "state veterinary officials." His hotline report did not claim that he was retaliated against for anything other than his participation and disclosures in the course of OIG's Iovino investigations and the disclosures made to the House Oversight Committee. Other allegedly "protected activity," including that referenced in those two paragraphs, was not alleged as the basis for his termination or any retaliatory action against him. Thus, those paragraphs will be struck.

Lastly, with regard to MSA's contention that paragraph 46 should be struck because one of its allegations is stated as being "upon information and belief," Lancaster does not respond to this argument in his opposition to the motion to strike. The court thus considers it unopposed. It also is supported by the authority cited by MSA. Accordingly, the court will grant the motion to strike paragraph 46 on this basis. Lancaster may include similar information in his amended complaint, but he may not improperly plead "upon information and belief."

## III.  CONCLUSION

For the foregoing reasons, the court will grant in part and deny in part MSA's motion to strike.  An appropriate order will be entered.

Entered: May 3, 2024.

*/s/ Elizabeth K. Dillon*
Elizabeth K. Dillon
United States District Judge