**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF VIRGINIA**
**HARRISONBURG DIVISION**

**GARRETT LANCASTER,**

*Plaintiff,*

**v.**

**MICHAEL STAPLETON ASSOCIATES, LTD. d.b.a. MSA SECURITY, INC.,**

*Defendant.*

**CASE NO. 5:23-cv-00063**

**FIRST AMENDED COMPLAINT**

**JURY DEMAND**

## I. INTRODUCTION

1. Plaintiff Garrett Lancaster (hereafter "Plaintiff" or "Mr. Lancaster") files this Complaint of discrimination against his former employer Michael Stapleton Associates, Ltd. d.b.a. MSA Security, Inc., (hereafter MSA or Contractor) for violation of 41 U.S.C. § 4712. This discrimination was in retaliation for Plaintiff reporting gross mismanagement of a Federal contract or grant, a gross waste of Federal funds, an abuse of authority relating to a Federal contract or grant, a substantial and specific danger to public health or safety, and/or a violation of law, rule, or regulation related to a Federal contracts, including via participating in federal agency and congressional investigations into said gross mismanagement, fraud, and mistreatment of canines, including medical malpractice by intoxicated and impaired medical staff, violation of animal protection and veterinary licensing laws, and abuse of authority by MSA management in failing to remediate the malpractice and retaliation. The discriminatory acts included retaliatorily investigating and terminating Plaintiff Lancaster.

## II. JURISDICTION

2. The CVC underwent several name changes between June 2016 and February 2022. In October 2019, the Bureau of Diplomatic Security (DS) changed the name of the CVC to the Diplomatic Security Canine Center (DSCC). Shortly thereafter, DS renamed it to the Diplomatic Security Canine Training and Operations Center (DSCTOC) and expanded MSA's contract to train and validate canines. Most recently, its name was changed from the DSCTOC to the Diplomatic Security Global Canine Center (DSGCC) on December 2, 2021. For simplicity, the acronym CVC is used throughout this complaint because that was the facility's name at the time of the whistleblower disclosures and retaliation.

3. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 on the basis that this complaint arises and presents federal questions under 41 U.S.C. § 4712, sub-titled "Enhancement of contractor protection from reprisal for disclosure of certain information."

## III. EXHAUSTION OF ADMINISTRATIVE REMEDIES

4. Mr. Lancaster administratively exhausted his claims under 41 U.S.C. § 4712(c)(2) on or after April 28, 2022. Hence, this action is timely pursuant to 41 U.S.C. § 4712(c)(2).

5. Mr. Lancaster filed his complaint with the State Department Office of Inspector General (hereafter "OIG") on June 9, 2019.

6. On March 2, 2021, the State Department Assistant Inspector General, Mr. Jeffrey D. McDermott, forwarded his report of the investigation of Mr. Lancaster's complaint to Michael W. Derrios, the Procurement Executive at the Office of Procurement Executive (hereafter "A/OPE"). The OIG substantiated the allegations that Mr. Lancaster had been subjected to unlawful reprisal by MSA.

7. On April 28, 2022, one year after the State Department's OIG had concluded that MSA did not provide clear and convincing evidence that it would have terminated Mr. Lancaster absent his protected disclosures, the Division Director of the Office of the Procurement Executive of the United States Department of State, Ms. Sharon D. James, made a 180 degree turn and denied Mr. Lancaster's relief under 41 U.S.C. § 4712. Ms. James did the same with regards to the previous conclusion in favor of Plaintiff Lancaster's colleague, Dr. Karen Iovino, who also filed a retaliation complaint after she made protected disclosures and was terminated by Defendant. Given her prior involvement with the MSA Project and Ms. James' predisposition to overturn OIG decisions in favor of Iovino and Garret, the apparent conflict of interest gives rise to a denial of due process.

## IV. VENUE

8. Venue lies in this United States District Court under 28 U.S.C. § 1391(b) and (c) by virtue of the fact that the Defendant, during relevant times, did business in this district.

## V. PARTIES

9. Plaintiff Lancaster is a citizen of the United States and resident of the Commonwealth of Virginia. Plaintiff Lancaster was an "employee of a contractor" within the meaning of 41 U.S.C. § 4712(a)(1). Defendant hired Plaintiff in October 2010 as an explosive detection canine handler. In December of 2015, Plaintiff Lancaster began work as a Validation and Training Specialist (VTS) at the CVC. Plaintiff Lancaster held the VTS position until Defendant unlawfully terminated him on June 7, 2019. Because Plaintiff Lancaster was employed by the Defendant under Defendant's contract with the State Department, Plaintiff Lancaster was, at all relevant times, an employee of a federal contractor.

10. Defendant MSA is a company, headquartered in New York City, providing security,

intelligence, training, and investigative services in the public and private sector. Defendant has a contract with the United States Department of State (hereafter "State Department" or DOS) under the Worldwide Protective Services (WPS) program to operate the Canine Validation Center (hereafter "CVC") in Winchester, VA. The State Department Bureau of Diplomatic Security (hereafter "DS") oversees this contract.

11. Canines A, B, and C are the dogs who were the victims of the medical practice and mistreatment as set forth in this Complaint.

## VI. STATEMENT OF GENERAL FACTS

### A. Common Facts:

12. Defendant MSA operates the Canine Validation Center (CVC), a canine training and care facility, under its contract with DOS in Winchester, Virginia, with the mission of providing specially trained dogs for national and international law enforcement purposes.

13. The CVC underwent several name changes between June 2016 and February 2022. In October 2019, the Bureau of Diplomatic Security (DS) changed the name of the CVC to the Diplomatic Security Canine Center (DSCC). Shortly thereafter, DS renamed it to the Diplomatic Security Canine Training and Operations Center (DSCTOC) and expanded MSA's contract to train and validate canines. Most recently, its name was changed from the DSCTOC to the Diplomatic Security Global Canine Center (DSGCC) on December 2, 2021. For simplicity, the acronym CVC is used throughout this complaint because that was the facility's name at the time of these whistleblower disclosures and the retaliation.

14. Defendant MSA publicly represents that it trains, cares for, and transports for commercial purposes, "over 800 company-owned canines". MSA's commercial transactions with these animals deploys them domestically and MSA represents that the "company's growing

fleet of more than 800 Canine Detection Teams are deployed internationally." MSA has more than 1,600 employees operating across more than 40 states and 50 countries.

15. Defendant MSA publicly represents that it is a "trusted service provider to the U.S. Government" supporting "a broad range of Federal Clientele", including:

- U.S. Department of State (DOS)
- U.S. Department of Defense (DOD)
- Office of Personnel Management (OPM)
- U.S. Department of Justice (DOJ)
- U.S. Department of Energy (DOE)
- Smithsonian Institution (SI)
- U.S. Department of Homeland Security (DHS)
- U.S. Department of Health & Human Services (HHS)
- Other Governmental Agencies (OGA)

16. Canines A, B, and C were enrolled and registered animal members of specially trained teams in which canines are paired with humans to accomplish a joint mission to protect employees and property of the United States. The success of these teams depends upon effective communication and close working relationships between their members, and a mutual commitment to protect each other.

17. The CVC conducts training pursuant to two State Department programs: 1) the Worldwide Protective Services program (hereafter "WPS"), which deploys the canines and their handlers to protect State Department facilities, such as embassies and consulates, and State Department personnel around the world; and 2) the Anti-Terrorism Assistance (ATA) program, which supplies foreign law enforcement agencies with EDC and trains canine handlers to properly handle and care for those canines.

18. In March 2016, the Bureau of Diplomatic Security's Office of Antiterrorism Assistance signed a Memorandum of Agreement with the CVC that established responsibility for the care requirements of dogs provided to foreign countries with CVC.

19. Pursuant to its contracts with the State Department, MSA operates the CVC to train and test Explosive Detection Canines (hereafter "EDC") and their handlers.

20. The State Department then provides the canines to other nations under the Anti-Terrorism Assistance program (hereafter "ATA"). The CVC includes a fully licensed veterinary hospital staffed with veterinarians, veterinary technicians, and support staff to provide care to the canines trained at the CVC.

21. On September 30, 2014, the State Department issued its first contract, in the amount of approximately $7.6 million over one year, to MSA for the operation and management of the CVC. In 2016, the CVC became operational and assumed responsibility for the canine training program of the Bureau of Diplomatic Security. In September 2015, the State Department issued an approximately $11 million, one-year contract to MSA for the operation of the CVC. Finally, in September 2016, the State Department issued a four-year contract with MSA for the operation of the CVC, with approximately $87 million obligated to date. The State Department's total obligations to MSA for the CVC as of May 2022 is $189,891,198.

22. During the time of the three contracts referenced above, Ms. Cathy J. Read was the State Department Director of Acquisitions Management, with ultimate responsibility for the three MSA contracts for the operation and management of the CVC with total obligations of more than $100 million. Ms. Read was a direct report to Ms. James.

23. On information and belief, during the time of the three contracts discussed above, Ms. James was the Division Director of the Bureau of Diplomatic Security Contracts Division,

with responsibility for the three MSA contracts for the operation and management of the CVC with total obligations to date of approximately $105 million.

24. Under the Defendant's federal contract, Plaintiff Lancaster was responsible for training and testing explosive detection canines and their handlers to ensure they met the State Department's security standards.

25. MSA employs three Deputy Project Managers (DPMs) at the CVC, each of whom has different responsibilities: one is responsible for CVC facilities and operational support (DPM 1 aka Alan Bower) one is responsible for CVC validations and testing services (DPM 2 aka Jeff Piacquadio), and one is responsible for CVC training (DPM 3 aka John Hoover). Plaintiff Lancaster reported to DPM 2, Jeff Piacquadio.

26. Removed.

**a. <u>Federal and State Statutes Protecting and Conferring Rights on Canines</u>:**

27. Federal and state laws protect the health, safety, and well-being of animals under human control. These laws extend to service animals, test subjects, and animals during domestic and international transportation as part of commercial business or activities. The statutes prohibit harmful acts, prescribe standards for certain types of activities, and require commercial permits.

See Congressional Research Service, "Federal Statutes Protecting Domesticated and Captive Animals" February 5, 2021.

28. The principal statute governing the humane treatment of animals is the Animal Welfare Act (AWA) of 1966, 7 U.S.C. §§ 2131-2159 (civil) and 18 U.S.C. § 49 (criminal) which regulate the treatment of animals in research, exhibition, transport, and regulates dealers. The AWA prescribes the minimum standards of care called the "minimum acceptable standard" for animal care and use. These standards include protections from "extremes of weather and temperatures, and adequate veterinary care". The Department of Agriculture promulgates regulations under the statute at 9 C.F.R. § 2.1 et seq.

29. 18 U.S.C. § 1368, the Federal Law Enforcement Animal Protection Act of 2000 criminalizes recklessly, willfully or maliciously harming any dog or horse employed by a Federal agency for law enforcement purposes.

30. Virginia Code § 3.2-6570 (1950, as amended) makes it unlawful to cause unnecessary pain to an animal and to deprive any animal of emergency veterinary treatment. Any person convicted of violating this section may be prohibited by the court from possession or ownership of companion animals.

31. Virginia law requires any person performing veterinary medicine to be licensed, including veterinarians and veterinary technicians. Virginia Code § 54.1-3800 (1950, as amended) requires licensing of a person practicing veterinary medicine who performs the diagnosis, treatment, correction, change, relief or prevention of animal disease, deformity, defect, injury, or other physical or mental conditions, including the performance of surgery, and the prescription or administration of any drug or medicine to animals. Virginia Code § 54.1-3806 (1950, as amended) authorizes the Board to license veterinary technicians to perform acts

relating to the treatment or the maintenance of the health of any animal under the immediate and direct supervision of a person licensed to practice veterinary medicine in the Commonwealth or a veterinarian who is employed by the United States or the Commonwealth while actually engaged in the performance of his or her official duties.

32. Virginia Code § 54.1-3804 (1950, as amended) gives the Veterinary Board the authority to establish essential requirements and standards for approval of veterinary programs. Under § 54.1-3805, no person shall practice veterinary medicine or as a veterinary technician in the Commonwealth unless such person has been licensed by the Board. Under § 54.1-3807, the Board may suspend or revoke any license to practice veterinary medicine or to practice as a veterinary technician.

**a. <u>Federal Statute Prohibiting Obstruction of Reporting to Law Enforcement Agencies:</u>**

33. Retaliation against whistleblowers is a violation of 18 U.S.C. § 1513(e), which provides:

> Whoever knowingly, with the intent to retaliate, takes any action harmful to any person, including interference with the lawful employment or livelihood of any person, for providing to a law enforcement officer any truthful information relating to the commission or possible commission of any Federal offense, shall be fined under this title or imprisoned not more than 10 years, or both.

**D. <u>Code of Conduct and Treatment of Canines:</u>**

34. The nature of MSA’s work presents unique legal demands on the company in providing necessary medical services to its canine team members. MSA's Code of Conduct obligates the company to not "tolerate mistreatment or cruelty towards any animals" and to ensure that these animals receive "humane treatment".

35. MSA's Code of Conduct contains binding representations to its employees, contractors, and funders, as well as to MSA's licensed veterinarians who act as fiduciaries in ensuring compliance with the legal rights of canines under their care. That Code of Conduct provides that it "is a key part of our Corporate Compliance and Ethics Program (the "Program"), which ensures that the Code of Conduct's provisions are communicated effectively to employees and enforced through MSA's policies, procedures and management practices (collectively, "Policies")".

**E. <u>Code of Conduct and Reporting Medical Malpractice:</u>**

36. MSA supervisors and managers are legally obligated to report canine medical malpractice and to take prompt and effective remedial measures to prevent it and to discipline violators. The Code of Conduct is based upon state and federal statutes and the company's DOS contract and provides:

> Every employee, officer, director, consultant, agent, vendor, subcontractor, or other representative of the Company having information or knowledge of any actual or contemplated conduct or transaction(s) which appears to violate MSA's Code of Conduct, Policies and Procedures, or standards is expected to report the matter promptly to their supervisor or manager, to Human Resources, to any member of MSA's Management including any member of the Senior Management Team, to the General Counsel, via our Hotline, or to the CCEO.

**F. <u>Code of Conduct and Discipline for Retaliation</u>:**

37. MSA supervisors and managers are legally obligated to protect employees and contractors who report canine medical malpractice and to take prompt and effective remedial measures to prevent retaliation against reporting staff and to discipline retaliating supervisors and managers. The Code of Conduct is based upon state and federal statutes and the company's DOS contract and provides:

> Employees at all levels are prohibited from retaliating against anyone for reporting in good faith a violation or suspected or potential violation of MSA's Code of Conduct, Policies and Procedures, or standards or for cooperating in an investigation of such an allegation.
>
> MSA will actively and aggressively monitor for any such retaliation. Any retaliation that can be substantiated will subject the retaliator(s) to disciplinary action up to and including immediate termination of employment without notice. (See MSA's Non-Retaliation Policy)
>
> Providing a channel through which employees and other parties may anonymously report suspected misconduct, compliance & ethics violations, and/or violations of laws or regulatory requirements;

**G. Code of Conduct and Confidentiality Obligations and Exceptions:**

38. Under MSA's Code of Conduct, employees are prohibited from "directly or indirectly" disclosing documents and information obtained during the course of their employment. However, directly or indirectly disclosing information and documents to any federal, state or local government agency, including non-law enforcement agencies is not prohibited or restricted in any manner, including through the employee's counsel. The Code of Conduct provides:

> It should be kept in mind, however, that an employee's duty of confidentiality in accordance with this Code of Conduct, MSA's Policies and Procedures or any employment related agreement shall not *in any manner prohibit or restrict* an employee from lawfully filing a charge or report with, or participating in an investigation, hearing or proceeding before *** an authorized investigative or law enforcement representative of a Federal department or agency (e.g., *Office of the Inspector General*), *or any other state, federal or local government agency*.

(Emphasis added).

39. The DOS OIG is such an authorized investigative or law enforcement representative. A state veterinary board is such a state agency, and the filing of a "report" or otherwise "participating in an investigation" for the state board is expressly authorized by the Code of Conduct. If those disclosures to government agencies are to be made by the employee

"in any manner" without "prohibition or restriction", he or she has a legal right to do so through their attorney.

## VII. BACKGROUND FACTS SPECIFIC TO PROTECTED ACTIVITY

40. On July 6, 2017, Plaintiff Lancaster's fellow MSA employee, veterinarian Karen Iovino, contacted the OIG to report that MSA and DOS officials engaged in misconduct, including personal use of government property. Dr. Iovino made several reports of MSA wrongdoing, including ultimately the mistreatment of the explosion detection canines.

41. After receiving Iovino's misconduct allegations in July 2017, the OIG requested information from the Department's Office of Acquisitions Management (AQM), the office responsible for awarding and administering contracts. AQM notified the Bureau of Diplomatic Security's Office of Overseas Protections (DS/DO) about the complaints, and the complaints were conveyed to MSA.

42. Dr. Iovino filed a whistleblower retaliation complaint with the Department of State OIG on August 4, 2017.

43. After Dr. Iovino's protected disclosures to MSA and the OIG, MSA terminated Dr. Iovino via letter dated August 18, 2017.

## VIII. PROTECTED ACTIVITIES

44. Plaintiff Lancaster was a witness to some of the concerns described in Iovino's complaint. On March 14, 2018, the OIG conducted an initial interview of Plaintiff Lancaster in response to Dr. Iovino's complaint. Plaintiff Lancaster provided information to the OIG relevant to Dr. Iovino's allegations, including information regarding employees' personal use of MSA/DOS property, including a snowblower, generator, and truck.

45. During the course of this investigation Lancaster also provided information regarding the relationships at the CVC between the DOS PM and MSA employees. He participated in at least one additional follow up interview with the investigators regarding the concerns identified in Iovino's complaint. Plaintiff Lancaster also provided credible evidence related to the investigation of an allegation of misuse of federal funds. Ultimately, Plaintiff Lancaster's disclosures contributed to a $240,000 recovery under the Program Fraud Civil Remedies Act.

46. Removed

47. On September 5, 2018, Plaintiff Lancaster spoke with a member of the House Oversight Committee about concerns surrounding the operations at CVC. The House Oversight Committee has broad congressional jurisdiction to investigate fraud, waste, abuse and

mismanagement in the Departments of State, Justice, Homeland Security, Defense, Veterans Affairs, and the IC. Plaintiff Lancaster discussed issues with said member and staff until January 2019 regarding conflicts of interest, relationships of DOS and MSA employees, abuse of power and the wellbeing of the EDCs.

48. MSA was aware of the Plaintiff's participation in various investigations, including through attendance at investigations and reports to MSA management regarding the same. On March 13, 2019, a special agent in OIG's Office of Investigations informed MSA that OIG was investigating allegations of improper kickbacks, false claims submitted to the government, and other federal crimes involving MSA and MSA personnel.

49. In March 2019, MSA filed *Michael Stapleton Associates, LTD v. Karen Iovino,* in the Arlington County Circuit, Case No. CL19000901-00 against Plaintiff Lancaster's co-worker Dr. Iovino. Said lawsuit alleged, in part, that the veterinarian "conspired" with "disgruntled current MSA employees" to "destroy MSA through a systematic campaign of defamation," referring to her filing "reports with various government agencies that had oversight over the company's activities." On April 1, 2019, in connection with the lawsuit, MSA issued a subpoena duces tecum for Dr. Iovino's communications with only one current MSA employee--Plaintiff Lancaster.

## IX. BACKGROUND FACTS RELEVANT TO ADVERSE ACTION AND PRETEXT

50. MSA validators conduct training and testing of the explosion detection canines. One of the tests involves placing explosive odors in boxes or suitcases, which are then used to test canine detection proficiency of the materials hidden in the containers. MSA had no written policies or SOPs regarding adjusting boxes at the relevant time of this complaint. According to MSA, is common for validators to have to adjust boxes, including sometimes with their feet.

51. MSA claims it records and stores six months of video of the canine detection tests. The video is not viewed in real time. MSA typically used videos to resolve a dispute when there is a disagreement about the outcome of a test. The DOS pays for the video equipment, but it does not require monitoring.

52. MSA claimed that on May 10, 2019, the MSA Human Resources/Facilities Manager at CVC Alan Bower observed through video surveillance that an MSA validator ("Validator 2" aka Joe Harrington) was rubbing his hands on a testing box that contained an explosive odor after the test had been set up for the teams of canines and handlers to begin testing. Manager Bower purported he was concerned by his observation because handling the box after placement could transfer an odor to the outside of the box, making it easier for a dog to detect the explosive odor and thus affecting the legitimacy of the test.

53. According to MSA, they gave Validator 2 an opportunity to explain his actions and then sent him home while MSA management investigated further. MSA notified the Department of State about the incident, claiming that Validator 2's actions were a "direct violation of CVC SOPs."

54. MSA represented it would review available video from December 2018 through May 2019 to determine if other validators had also deviated from standard operating procedures (SOPs). MSA initially asked two MSA CVC employees to conduct the video review, but MSA pulled one from the assignment due to other MSA requirements.

55. On May 13, 2019, MSA gave Validator 2 the choice to resign or be terminated. Validator 2 chose to resign.

56. On June 17, 2019, several weeks after MSA informed the Department that a

validator's actions were "a direct violation of CVC SOPs," and after MSA unlawfully terminated Plaintiff Lancaster for alleged SOP violations as described below, MSA finalized "Security Operations Management System, Annex 3 WPS Program Requirements," which prohibited kicking, manipulating, and dropping the boxes or containers, among other requirements.[1] Said SOPs were neither completed nor distributed to the employees prior to MSA discriminatorily investigating and terminating Plaintiff Lancaster.

## X. ADVERSE ACTIONS

57. MSA management started creating a hostile work environment for Plaintiff Lancaster, including informing his co-workers that MSA management was unhappy about the OIG investigations and believed Plaintiff Lancaster was a source of information, including calling Plaintiff a "bad element". Further, in March 2019, MSA filed a lawsuit against Dr. Iovino that implicated Plaintiff as a "co-conspirator" to take down MSA through defamation.

58. On May 21, 2019, MSA management placed Plaintiff Lancaster on administrative leave. MSA claimed that an internal video review suggested that Plaintiff Lancaster rubbed a training aid or manipulated the canine detection testing boxes after placement of the box. Plaintiff Lancaster did not manipulate the boxes, but he may have adjusted the boxes, as was an MSA common practice.

59. During the May 21, 2019 meeting, Plaintiff Lancaster asked to see the videos so he could review and explain his actions, as he was unsure to what the MSA managers were referring that could possibly be construed as manipulation. MSA denied his request. MSA told Plaintiff Lancaster that Plaintiff would remain on administrative leave pending a second review.

60. On May 22, 2019, MSA officials submitted a follow-up incident report to the

---

DOS claiming that Plaintiff appeared to have repeatedly deviated from CVC SOPs in coordination with Validator 2 and that in at least one instance a part-time MSA employee, CVC Validator ("Validator 3" aka Frank Tortorella), similarly deviated from the CVC SOPs.

61. On May 23, 2019, MSA sent a final incident report to DOS, in which MSA claimed Plaintiff Lancaster's actions caused concern on three days: December 7, 2018; March 28, 2019; and May 9, 2019.

62. Yet also on May 23, 2019, a management selected MSA employee began a new review of the videotapes. He sent his report to MSA's General Counsel on June 3, 2019. The second review did not identify employees by name but noted dates and twenty-eight "anomalies" that "appeared to be inconsistent with normal testing protocols" or "appeared to be intentional efforts to create an advantage to the teams." The first and second reviews did not agree on the number of dates of concern, the specific dates of concern, times of incidents, or identity of individuals who purportedly caused concern. The OIG found generally, of the 17 dates for which the reviewers found possible deviations, there were only 5 dates (less than 30 percent) for which the reviewers agreed that deviations had occurred. Ultimately, when MSA assessed intent, they could not find a pattern that Plaintiff Lancaster engaged in that would benefit any particular vendor.

63. After OIG's request to MSA for information linking the issues noted in the second review with named individuals, MSA management identified Plaintiff Lancaster to the OIG as an individual of concern from the second review on two dates: December 7, 2018 and May 2, 2019.

64. On June 7, 2019, the CVC PM, Mike Hayes, and MSA's Chief HR Officer, Peter Capizzi met with Plaintiff Lancaster via teleconference and told him he could resign or be

terminated. Plaintiff Lancaster's requests to see the videos were once again denied. Plaintiff Lancaster declined to resign. Then MSA terminated Lancaster orally during the teleconference.

64. Via letter dated June 7, 2019, signed by the CVC PM, MSA terminated Plaintiff. MSA stated the claimed reason for termination was that he "did not follow protocol as a validator on several occasions" and that his "actions violated MSA's Code of Conduct and undermine[d] MSA's relationship with the U.S. Department of State." MSA purposely used especially and discriminatorily harsh language for Plaintiff Lancaster, different from that MSA chose to use with other employees they claimed committed similar infractions, stating:

> As you know, our customers rely on us to fulfill our contractual commitments, including following all protocols, which directly impact the safety or potential safety of individuals both here and abroad. Over the past several weeks, an independent investigation was conducted, reviewing certain aspects of the CVC operation. As a result of our investigation, it was determined that you did not follow protocol as a validator on several occasions. Your actions violated MSA's Code of Conduct and undermine MSA's relationship with the U.S. Department of State.

However, the termination letter for another validator stated: "As we have discussed, with changes we are making at the CVC, we will not be requiring your services at the CVC in the future. We appreciate your service to the Company."

65. MSA provided inconsistent justifications concerning what specific rule or policy Plaintiff Lancaster purportedly violated, and MSA's documentary evidence in support of Mr. Lancaster's termination is significantly lacking.

## XI. CLAIM

### A. DISCRIMINATION IN VIOLATION OF 41 U.S.C. § 4712.

66. Plaintiff realleges all Paragraphs 1-65 above.

67. The foregoing facts demonstrate that Defendant is and was during the relevant times a federal contractor.

68. The foregoing facts demonstrate that Plaintiff was the employee of Defendant, a federal contractor, from October 2010 to June 7, 2019.

69. Removed

70. The foregoing facts demonstrate that Plaintiff made disclosures to the persons and bodies identified by 41 U.S.C. § 4712(a)(2): 1) an Inspector General, 2) a federal employee responsible for contract or grant oversight or management at the relevant agency, 3) a management official or other employee of the contractor, MSA, who had the responsibility to investigate, discover, or address misconduct, and 4) a state official.

71. Defendant committed prohibited adverse acts against Plaintiff Lancaster by subjecting Plaintiff to a hostile work environment, including negative statements against him, such as calling him crazy and a bad element, placing him on administrative leave, terminating him, and writing a termination letter with particularly hostile and discriminatory language, designed to injure his reputation and credibility, in retaliation for Plaintiff's protected activities, thereby violating 41 U.S.C. § 4712.

72. Defendant's retaliatory actions against Plaintiff Lancaster have caused Plaintiff actual, economic, non-economic, compensatory and special damages, including but not limited to (a) damage to Plaintiff's career and ability to obtain the highest level of employment within

Plaintiff's industry, (b) lost wages, income, and benefits, (c) damage to Plaintiff's professional reputation and interruption of Plaintiff's demonstrated work history, and (d) ongoing mental and emotional distress, humiliation, embarrassment, loss of self-esteem, and diminution in Plaintiff's enjoyment of life.

## XII. PRAYER FOR RELIEF

73. *WHEREFORE*, Plaintiff Lancaster requests that the Court award Plaintiff the following:

a. Reinstatement to employment with Defendant at the same position he held before the reprisal, and if reinstatement is not ordered, then front pay for a period of at least five years;

b. Upon reinstatement, an injunction directing Defendant to remediate the hostile work environment, harassment, and intimidation to which it subjected Plaintiff;

c. Back pay for all lost wages and benefits, including lost bonuses;

d. Economic damages for injury to Plaintiff's career, professional reputation, and earning capacity, in an amount to be determined at hearing;

e. Non-economic damages for mental and emotional distress, embarrassment and humiliation, in an amount to be determined at hearing;

f. Expungement of written warnings, reprimands, negative performance appraisals, and other derogatory information and references which have been placed in Plaintiff's personnel file after his protected disclosures;

g. Posting of a notice to Defendant's employees indicating that Defendant has been ordered to comply with 41 U.S.C. § 4712 and to make appropriate restitution to

Plaintiff;

h. Reasonable costs and attorney's fees, together with the cost of expert witnesses; and

i. Defendant should be ordered to provide a neutral employment reference, to include dates of employment, job title, and final wage rate, to all potential employers regarding Plaintiff in the event reinstatement is not ordered; and

j. All other relief that may be available from law and equity.

k. Plaintiff demands trial by jury.

Respectfully Submitted,

/s/Nate L. Adams III
VSB No. 20707
Nate L. Adams III, P.C.
ADAMS AND ASSOCIATES
11 South Cameron Street
Winchester, VA 22601
(540) 667-1330
**nadams@nadamslaw.com**

/s/ Stephani L. Ayers
*pro hac vice*

Government Accountability Project
1612 K Street, N.W., Suite 1100
Washington, D.C. 20006
(813) 382-7865
stephani@whistleblowerdefenders.com

Attorneys for Mr. Lancaster